532 So.2d 574 (1988)
Fred Milton JONES
v.
Eunice Rebecca Lucius JONES.
No. 57912.
Supreme Court of Mississippi.
October 5, 1988.
Rehearing Denied November 2, 1988.
*575 Robyn R. Crouch, Richard B. Schwartz, Schwartz & Associates, Jackson, for appellant.
Wren C. Way, Way & Field, Vicksburg, for appellee.
En Banc.
ROBERTSON, Justice, for the Court:

I.
This divorce action falls into a familiar pattern. The husband decreed divorced vigorously argues that his wife did not prove her grounds, not because he has the remotest thought of resuming a normal marital relationship but to undercut the financial provisions decreed for her benefit. The husband further challenges that he give his wife an equitable proportion of real property held in his name, this notwithstanding his wife's monetary and in kind economic contributions to the material success of the marriage.
We affirm.

II.

A.
Fred Milton Jones (Fred) and Eunice Rebecca Lucius Jones (Becky) were married on December 24, 1954, in Webster County, Mississippi. The Jones have two daughters, Deeta Rebecca Jones Davis, born in 1959, and Lucia Lynn Jones, born in 1967. The couple permanently separated on May 24, 1983.
Fred Jones is now living in the family home in Pearl, Mississippi. Becky is living in Pensacola, Florida. Deeta Jones Davis is now married and living in Laurel, Mississippi, where she is employed as a chemist. Lucia Jones is a student at the University of Alabama.
Both Fred and Becky agree that the major point of friction in their marriage resulted from differences of philosophy regarding the upbringing of the daughters. Fred characterized himself as a "strict disciplinarian" and accused his wife of being "liberal". Becky testified that Fred's displays of violence began in October 1980. As the result of some disagreement, he instructed Deeta, then a senior at Mississippi College, to leave home, take all of her belongings with her, and never return. At this time Fred also forbade Becky from attempting to see her daughter.
Becky testified that through 1981, Fred's displays of violence became more frequent and Becky began to surreptitiously taperecord the couple's arguments.
In June 1982, the couple separated for a period of three months. The couple reconciled and Becky returned to the home in Pearl in August 1982.
In October 1982, Fred and Becky had a disagreement over the disciplining of their daughter Lucia, then fifteen years old. A loud confrontation occurred at a local department store. Fred accused Lucia of being sexually promiscuous and accused his *576 wife of condoning this promiscuity by arranging meetings for the young couple. Lucia refused to return home with her parents and was taken into the custody of the Mississippi Department of Welfare at that time. After hearings were conducted by the local Youth Court, Lucia was placed in the Vicksburg home of her uncle Ray Lucius. Becky testified that as a result of the incident with Lucia, Fred beat her with a belt. In his testimony Fred denied ever subjecting his wife to mental or physical abuse. In her rebuttal testimony, however, Becky introduced into evidence photographs taken of her by a neighbor after the October 1982 beating. The photographs reveal eight to ten silver dollar-sized bruises on Becky's thighs and buttocks.
Becky testified that after the October 1982 incident involving Lucia, Fred began to threaten her with a loaded gun. She also stated that in December 1982, Fred forced her at gunpoint to take a car trip to a remote levee in Louisiana. According to her testimony, Fred told her that the purpose of the trip was to find an appropriate place to leave her body once he had shot her between the eyes. Becky offered to provide Fred with the tape recordings that she had made of their arguments if he would spare her life. These tapes were stored in a safety deposit box in a bank in nearby Vicksburg. While Fred was collecting the tapes from the safety deposit box, Becky alerted a bank employee and the police were called. Becky left with the police and entered the Catholic Home for Battered Women. Fred unequivocally denied that this event ever took place.
On January 3, 1983 Becky returned home at Fred's insistence and upon his reassurance that he would reform. Four months later, she decided to flee her home when on May 6, 1983, her husband placed two loaded shotguns on a table and demanded that they stand at opposite ends of the family room and have a western-style "shoot-out". The winner of the "shoot-out" would take all of the property. The confrontation lasted until the early hours of the following morning. Fred denied that this event ever took place.
Becky stated that after this incident she began to make preparations for leaving Fred. She transferred funds from their joint checking account to an account she had opened at a Vicksburg bank and she rented an apartment in Vicksburg. Becky left the home on May 24, 1983, and has not returned. She filed for divorce two weeks after her departure. Becky stated that she moved to Pensacola in an effort to distance herself from Fred, who she fears may still try to harm her. Fred's testimony at trial was primarily composed of his observations made while conducting his own "surveillance" of Becky in Vicksburg and Pensacola.

B.
At the time of the marriage in December of 1954, Fred had just returned from service in Korea and Becky worked as a billing clerk at a transport company. During the first years of their marriage Becky supported the couple while Fred attended high school and college with funds provided by the G.I. bill. Fred completed his education in 1958, receiving a degree in Business Administration.
During this time the Joneses purchased a number of vacant lots and developed a mobile home park. Also during this time the Joneses purchased their residence in Pearl, Mississippi. Becky testified that, apart from one business loan for the mobile home park development and a V.A. mortgage for the residence, all of the money spent on the acquisition of these assets came from her earnings at the transport company. Becky ended her employment at the transport company two months before the birth of Deeta, the Joneses' eldest daughter. This occurred in 1959.
Soon after receiving his business degree in 1958, Fred went into business for himself developing real estate and building homes. Becky contributed to the family business with her secretarial and bookkeeping skills  typing deeds, keeping the books and financial records and verifying invoices.
In 1961, the couple purchased six acres in downtown Pearl, Mississippi. Fred was *577 the sole grantee listed in the deed. On this land the Joneses developed "Jones Center", a shopping center that has grown to include twenty-two separate buildings which are leased to various retail merchants. In 1983, Jones Center had an appraised value in excess of $700,000.00 and provided the Jones with over $5,000.00 per month in income from the leases.
By 1969 Fred and Becky had accumulated six to ten separate undeveloped tracts of land in addition to the shopping center. They held these lots as joint tenants. It was about this time that Fred was hospitalized for ninety days suffering from depression and seizures. By his own account, Fred had a "nervous breakdown". Becky testified that after being released from the hospital, her husband was unable to carry on the business of managing the shopping center and she assumed those duties. Subsequent to his hospitalization Fred was declared totally disabled and began drawing disability benefits from the Veterans Administration and the Social Security Administration.
In October, 1972, Fred was diagnosed as suffering from a brain tumor. Thinking he might die as a result of the tumor, he conveyed all his interests in all of the properties to his wife. All of these deeds were promptly recorded. At this same time Becky executed deeds conveying to her husband all of her interests in these properties. These deeds were not recorded.
Fred slowly recovered from his illness, despite his refusal to submit to surgery. In the 1970's Becky and Fred acquired two or three additional parcels of real estate all of which were later deeded to Becky with contemporaneous deed-backs to Fred. As with the 1972 transactions, the deeds to Becky were recorded while the deed-backs to Fred went unrecorded. All of these unrecorded deeds were kept in a safe at the Joneses' residence in Pearl.
In 1975, Becky began attending classes at Jackson State University and received a Bachelor's Degree in Business Administration. She then attended classes at Mississippi State and received a Master's Degree in Counseling in 1983.
In 1980, Becky conveyed two residential lots to her daughter Deeta without Fred's knowledge. In 1981, Fred assigned all of his rights as lessor of Jones' Center to Becky. Jones' Center is encumbered by a deed of trust executed by Becky and for which she remains liable. At some point in 1982 Becky destroyed all of the unrecorded deeds which purported to convey her property interests to Fred.
In September 1982, Fred declared bankruptcy claiming unsecured debts in the amount of $157,000.00. In his Schedule of Assets filed with the bankruptcy court, Fred listed his car (worth $600.00) as his only asset. In addition, Fred listed his occupation as "retired on disability." At the time of the bankruptcy Becky was the owner of record of all of the property accumulated by the couple.
In January 1983, following a period of separation which lasted one month, Becky typed and then executed deeds conveying all of the couple's property back to Fred. These deeds remained unrecorded until 1984, well after Becky had filed for divorce. In the meantime, however, Becky had conveyed another of the couples' investment properties (a chicken farm) to her brother Ray Lucius.

C.
At the conclusion of the hearings on the matter, the Chancery Court held:
(1) That Becky was entitled to a divorce on the ground of habitual cruel and inhuman treatment; that "on many occasions" threats were made by Fred and that on several occasions physical violence occurred;
(2) That the property was "accumulated by the parties" and that the record reflected that Becky "did contribute to the acquisition and the operation of the property";
(3) That, because of her ability to support and maintain herself, Becky was not entitled to alimony as such;
(4) That "because of the fact the Court is finding and adjudicating that this property was accumulated after a long marriage and *578 during a long marriage by these parties," Becky and Fred should both be adjudicated to be equal owners of the accumulated property.
The Court later conducted hearings regarding the extent and value of the couple's property holdings. In its final judgment the Court identified nine parcels of real property, including Jones Center, which were accumulated during the marriage through the joint efforts of Becky and Fred.[1] The Court made an equal division of the properties jointly accumulated by Fred and Becky. Since Becky had conveyed three of these parcels to third parties who were not parties to the divorce suit (Deeta Jones Davis and Ray Lucius), Becky's fifty percent share was reduced by the value of the properties conveyed. The Court determined that Becky was therefore entitled to a two-fifths (2/5ths) interest in the remaining six parcels.

III.
On appeal, Fred first argues that the evidence was insufficient as a matter of law to support a finding that he had been guilty of habitual cruel and inhuman treatment of his wife. See Miss. Code Ann. § 93-5-1 [Seventh] (1972). The point is specious. Beginning in 1981 and continuing for the next two years, Fred repeatedly subjected Becky to threats upon her life. There were instances of severe physical abuse in addition to numerous occasions of physical intimidation.
Despite Fred's denial that he had ever subjected his wife to physical abuse, the Chancery Court found that "on several occasions there was bodily harm that was incurred by the wife." There is substantial support for this conclusion in the record. Becky testified to three distinct instances in which she suffered a physical beating at the hands of her husband. In July of 1981, she suffered a broken nose during a quarrel with Fred. In October, 1982, Fred beat her with a belt after their daughter Lucia was taken into the custody of the Mississippi Welfare Department. Finally, in May, 1983, Becky suffered a black eye when Fred caught her attempting to make photocopies of the deeds to Fred which she had recently executed.
Ultimately, this Court is constrained by its limited scope of review, particularly when, as here, the resolution of the case turns on the credibility of the witnesses. When there are before us only general findings of fact, this Court proceeds on the assumption that the court below resolved all fact issues in favor of the appellee. Ross v. Brasell, 511 So.2d 492, 495 (Miss. 1987). Confronted with similar evidence of habitual cruel and inhuman treatment, the Court in Chaffin v. Chaffin, 437 So.2d 384 (Miss. 1983), stated: "We take complainant's testimony at its best, as suggested in Burnett v. Burnett, 271 So.2d 90 (Miss. 1972), and find that it does establish the grounds set out in the complaint."
Based upon the uncontested portions of Becky's testimony and that of her daughters, the Chancery Court found that sufficient evidence existed to award her a divorce on the grounds of habitual cruel and inhuman treatment. From the evidence summarized above viewed under the applicable legal standards, we have no authority but to affirm. See, e.g., Day v. Day, 501 So.2d 353, 354 (Miss. 1987); Haralson v. Haralson, 483 So.2d 378 (Miss. 1986); Stennis v. Stennis, 464 So.2d 1161 (Miss. 1985); Gallaspy v. Gallaspy, 459 So.2d 283, 285 (Miss. 1984); Wires v. Wires, 297 So.2d 900, 902 (Miss. 1974).
The assignment of error is denied.

IV.
Fred next urges that the Chancery Court erred when it decreed an equitable division of real property title to which was in his name exclusively.[2] He asserts error insofar *579 as the Court divested him of title in the identified parcels of real estate for the benefit of his spouse.
The principle for which Fred argues has been effectively eroded in cases where the wife contributed her money and labor toward the economic success of the marriage.
Consider, for example, the case of Clark v. Clark, 293 So.2d 447 (Miss. 1974). Mrs. Clark had, for many years, served her husband as a bookkeeper and receptionist at her husband's construction company. She had worked eleven years in her husband's business without compensation. During that time the couple had accumulated $164,000.00 in assets. The Court suggested that an equitable lump-sum alimony award should be given the wife in such circumstances.
Under these circumstances, the wife, helpmate and co-worker who is forced out of the marriage partnership through no fault of her own is entitled to a fair, equitable and just allowance. This can be accomplished in the discretion of the chancellor . .. by either a lump-sum award, plus monthly alimony payments or monthly alimony payments of such a substantial nature that it reflects not only the husband's duty to care for his former wife ... but also her share in the jointly accumulated assets. .. .
-293 So.2d at 449 (emphasis added). The Court went on to point out that the savings accounts held by the husband "can be subject to a lien in order to enforce the payment of a lump-sum judgment or a monthly alimony award." 293 So.2d at 450.
A factual situation nearly identical to Clark  and quite similar to the case at bar  came to the Court in Reeves v. Reeves, 410 So.2d 1300 (Miss. 1982). Mr. Reeves was a real estate investor who was essentially penniless when married but had amassed a net worth of $2,500,000.00 at the time of the divorce. His wife had assisted him "by writing checks, reconciling bank statements, picking up building materials, keeping track of materials, collecting rents and doing whatever she or her husband felt was necessary to promote the business." 410 So.2d at 1301. With the exception of their home, all properties purchased by the couple were held in the husband's name alone. Among other assignments of error, Mrs. Reeves appealed the chancellor's award of $6,000.00 lump-sum alimony as grossly inadequate. In discussing Mrs. Reeves entitlement to a portion of the couple's accumulated wealth, the Court stated:
In Clark v. Clark, 293 So.2d 447 (Miss. 1974), we held that where the wife has, without salary or remuneration, worked in her husband's business and contributed to the accumulation of assets, she is entitled to some share therein.
* * * * * *
In Jenkins v. Jenkins, 278 So.2d 446 (Miss. 1973), we recognized the propriety of a substantial lump-sum award where the husband had accumulated considerable property and the wife's contribution was doing her part as housewife. These holdings, as we stated in Clark, do not make Mississippi a community property state, but further delineate the serious responsibility of a chancellor to make intelligent and fair provision for the wife.
-410 So.2d at 1302-03.
Reeves again recognized that a "substantial" lump-sum alimony award may be granted to a contributing spouse in fact situations similar to that here.
What effect this recognition of the value of uncompensated business support would have toward the larger question of the definition of "jointly accumulated property" was resolved in Watts v. Watts, 466 So.2d 889 (Miss. 1985). The Court in Watts was again presented with a wife's equitable *580 claim to realty held in her husband's name. The Court perceptively recognized the functional equivalence between an equitable division and a substantial lump-sum alimony award.
Appellee had requested this division of the jointly accumulated property in her pleadings; it was not granted in the way of alimony, nor in lieu of alimony. A chancellor is not limited to awarding only alimony and a share of personalty to a spouse after nearly two decades of marriage. Of course, chancellors may award exclusive use and possession of such property, or a lump-sum alimony, the effect of which would cause the owner of record to sell the land to pay it or allow the aggrieved spouse to place an equitable lien on the land, or a property lien after obtaining a judgment for non-payment of lump-sum alimony. It would offend equity to uproot one of the spouses from the homestead property which was jointly accumulated simply because that spouse's name did not appear on the deed thereto. Rather, an equitable division of jointly accumulated realty would be appropriate.
-466 So.2d at 891 (emphasis added).
While Watts and its progeny broadened the chancery court's authority to effect an equitable distribution of jointly accumulated property, other recent cases have wrestled with the definition of "contribution" in the context of the acquisition of assets. If "contribution" toward the acquisition of assets is proven by a divorcing party, then the court has the authority to divide these "jointly" accumulated assets.
Pickens v. Pickens, 490 So.2d 872 (Miss. 1986), relied upon Chrismond v. Chrismond, 211 Miss. 746, 52 So.2d 624 (1951) in affirming a chancery court's equitable division of an unmarried couple's real and personal property. As to the contributions of the wife, the Court stated:
In determining what is an equitable division, the chancellor is by no means limited to an consideration of the earnings of the parties and cash contributions made by each to the accumulation of properties. As any freshman economics student knows, services and in kind contributions have an economic value as real as cash contributions. In such situations, where one party to the relationship acts without compensation to perform work or render services to a business enterprise or performs work or services generally regarded as domestic in nature, these are nevertheless economic contributions. Cf. Tedford v. Dempsey, 437 So.2d 410, 422 (Miss. 1983). They are to be valued by reference to the cost of similar services in the marketplace.
-490 So.2d at 876.
In summary, the authority of the chancery court to effect an equitable distribution of marital property upon the dissolution of the marriage is guided by the following principles:
(1) A divorcing spouse who has assisted his wife or her husband in the accumulation of wealth during the marriage as reflected by an increase in net worth may be awarded lump-sum alimony reflecting an equitable portion of the increase. Clark; Reeves.
(2) The payment of the lump-sum award may be secured by placing an equitable lien upon the property of the debtor spouse. Buckalew v. Stewart, 229 So.2d 559 (Miss. 1969); Clark; Watts.
(3) Claims for property distribution incident to divorce may be agreed to by the parties in a property settlement. These agreements may be specifically enforced by the chancellor even to the extent of ordering the conveyance of realty from one spouse to the other. Wray v. Langston, 380 So.2d 1262 (Miss. 1980); Watts.
(4) A spouse who has made a material contribution toward the acquisition of property which is titled in the name of the other may claim an equitable interest in such jointly accumulated property incident to a divorce proceeding. Chrismond; Watts.
Seen in the foregoing context, the final judgment before us today is beyond our authority to disturb. Because of Becky's contributions  contributions to the *581 business activities of the parties  both her cash contributions and her in kind services in working with her husband and at times managing the business, our law vested in the Chancery Court authority to order an equitable division of the marital property, including the transfer of title to real property. The factual findings necessary to support the decision of the chancellor are supported by substantial credible evidence and are thus insulated from disturbance via appellate review. See Norris v. Norris, 498 So.2d 809, 814 (Miss. 1986); Carr v. Carr, 480 So.2d 1120, 1122 (Miss. 1985).
The assignment of error is denied.

V.
Fred Milton Jones has assigned several other areas and argued several further points none of which have merit or require discussion. Put otherwise, all of Fred's assignments of error have been carefully considered and are denied.
AFFIRMED
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.
PRATHER and ZUCCARO, JJ., concur by separate written opinion.

APPENDIX

 SCHEDULE OF THE JONESES' PROPERTY HOLDINGS
 Property Held In Fred Jones' Name
Parcel # Description Assessed Value Date Acquired
 1 Undeveloped Residential Lot $ 6,770.00 Before 1972
 2 Joneses' Residence $ 49,260.00 12/2/57
 3 Two adjacent undev. residential $ 15,000.00 7/3/59
 lots
 4 Undeveloped 8-acre tract $ 40,000.00 6/4/73
 5 Jones Center $718,830.00 2/28/61
 6 16 cemetery lots ? ?
 Property Held By Third Parties
 7 Undeveloped Residential lot $ 7,500.00 Before 1972
 8 Undeveloped Residential lot $ 7,500.00 Before 1972
 9 Chicken farm $49,270.00 6/11/79

PRATHER, Justice, concurring:
I concur in today's judgment affirming the judgment of the Chancery Court of Rankin County. I write separately because a candid assessment of the facts of this case suggest that we ought to confront directly the continued viability of one of our longstanding rules of law. I refer to the rule that says that, incident to a divorce where the wife's primary contribution to the marriage has been as a homemaker, the Chancery Court has broad authority in settling marital rights to reach deeply into a man's pocketbook, but it may not touch his real property.[1]
Without doubt, the evidence in the record reflects that Becky Jones contributed of her own money to the acquisition of the properties at issue and, further, that she worked with Fred in the business and in the development of the marital assets held by the parties. Candor requires recognition that Becky made a third contribution  as a homemaker for some 24 years, and rearing two children  and that reliance upon this third factor, is requisite to affirmance of the particular equitable division of marital property ordered by the Court.
Mississippi's longstanding rule is that the Chancery Court cannot divest a spouse of title to real property, forcing that spouse to deed the property to the other by judicial decree. See, e.g., McCraney v. McCraney, 208 Miss. 105, 43 So.2d 872 (1950). Careful reading of our cases of the last ten years suggests rather clearly that this rule has been eroded to the point where it is the *582 exception, not the rule; that is, in dividing marital property the Chancery Court has broad power to order an equitable distribution of personal property, and it has the power to order substantial lump sum alimony even where, as a practical matter, the only way that lump sum alimony can be paid would be for the husband to sell certain real property. See, e.g., Reeves v. Reeves, 410 So.2d 1300 (Miss. 1982).
The rule of equitable distribution of marital property I advocate here has been adopted in practically every other state. While erosion of the old title theory is well under way in Mississippi, it is complete elsewhere.
Three distinct types of equitable distribution exist in the United States today. In community property states[2] all property acquired during the marriage is deemed to be owned jointly by the spouses and upon a dissolution of the marriage the parties are entitled to share equally in the so-called "marital property". Forty-one states ascribe to the doctrine of equitable distribution.[3] Mississippi remains as the only state which does not permit a court to divide real property in a divorce action titled in one spouse.[4] However, Mississippi permits divestiture of title in resulting trusts situation. Watts v. Watts, 466 So.2d 889 (Miss. 1985). These states permit a court of equity to distribute property upon divorce without respect to which spouse actually holds title to the property.
The doctrine of equitable distribution permits the spouse who has made a material economic contribution toward the acquisition of property, which may be titled in the other spouse, to claim a marital interest in such property upon divorce. The economic contributions made by both spouses during the marriage are weighed against the assets acquired during the marriage ... that are available at the time of the divorce. In computing the value of any asset, the indebtedness owed against such asset would ordinarily be deducted from its fair market value. The non-monetary contributions of a homemaker are considered, in a number of states, to be the equivalent of the wage earner's economic contributions.
In a majority of equitable distribution states, "separate property" is not subject to distribution. This is generally defined as property owned before marriage, inherited property, property gifted by third persons, or property excluded by valid agreement of the parties.
D. Freed and T. Walker, "Family Law In The Fifty States: An Overview", 21 Fam. L.Q. 417, 456 (1988).
The core issue in this form of equitable distribution is the threshold determination made by the court dividing the total assets of both parties into "marital property" which is subject to distribution and "separate property" which is not.
Once separated into "marital" and "separate" properties the court awards to each party a percentage of the "marital estate". In many states where the equitable distribution of property is controlled by statute, the apportionment of the marital estate is based upon a detailed list of factors contained in the legislation itself. In states where the controlling legislation grants a general power of equitable distribution to the chancery courts, judicial decision supplies the guidelines used in the apportionment. Whatever the source, the factors governing the division of the marital estate are nearly uniform and usually include the length of the marriage; the property brought to the marriage by each party; the economic contributions of each party to the marriage; the earning capacity and economic circumstances of each party; and the tax consequences of the division to each party.
*583 The final method of property distribution, and to which Mississippi is the final adherent, is known as the "title theory". In title theory states, upon dissolution of marriage, courts do not have any general or equitable power to distribute property, except as to jointly held property. Courts are not permitted to transfer property held in one party's name to the other party. In some instances the court may impress a resulting or constructive trust upon one party's property for the benefit of the other spouse. This power, however, is available in limited circumstances and is constrained by the applicability of standard trust principles. A number of states have recently abandoned the title system of distribution in favor of the equitable distribution of marital property. New York (1980), Pennsylvania (1980), Florida (1980), South Carolina (1982), and West Virginia (1983) are the most recent states to have abandoned the title system of property distribution in divorce proceedings. McCahey, John P., Valuation And Distribution of Marital Property, § 3.01 (1988).
We are told, however, that there is good reason why Mississippi clings to these last vestiges of the title rule. It has been suggested that stability in real estate titles must be maintained, particularly protecting lienholders' rights. However, this argument holds no validity for no equitable distribution rule could ever alter, change, or modify lienholders' priorities. Clearly, the power to force the conveyance of property from one divorcing spouse to the other is within the purview of Miss. Code Ann. § 93-5-23 (1985). Cf. Chrismond v. Chrismond, 211 Miss. 746, 757, 52 So.2d 624, 629 (1951). If there be any other such reason, no one has stated it. The rule certainly cannot be justified on any principled basis. It is inconsistent with well recognized premise that homemaking services as well as direct monetary outlay may be considered as "contribution" toward the acquisition of "jointly accumulated property." Jenkins v. Jenkins, 278 So.2d 446 (Miss. 1973); Tedford v. Dempsey, 437 So.2d 410, 422 (Miss. 1983); Pickens v. Pickens, 490 So.2d 872, 876 (Miss. 1986); and Regan v. Regan, 507 So.2d 54, 56 (Miss. 1987).
Put otherwise, there is no principled distinction of relevance here between real property and personal property. Imagine hypothetically the divorce of two couples, Frank and Mary and John and Nancy, each of which has been married for twenty years. Imagine further that in each instance the wife, Mary or Nancy, has been without legal fault and has made her primary contribution to the marriage as a homemaker and in rearing the children. Assume further that Frank has net assets of in excess of $1,000,000.00 all of which is in the form of income producing real estate while John has net assets of $1,000,000.00 consisting of cash and readily convertible securities. On what rational basis might it be argued that Mary's remedies incident to the divorce ought to be different or lesser than Nancy's? The question answers itself: None.
A point bears emphasis. Our law already abounds with holdings that, incident to a divorce where the woman's contribution consisted primarily of homemaking duties, the Chancery Court has the authority to predicate upon that fact an award of substantial lump sum alimony. In Jenkins v. Jenkins, 278 So.2d 446 (Miss. 1973), the Court held that, even though the wife's duties were "solely those of a housewife", she was entitled to an award of lump-sum alimony based upon an increase in her husband's net worth over the course of the marriage.
At the beginning of the marriage they had no assets and the husband made a salary of $85.00 per week. At the time of the divorce the appellee admitted assets of $800,000.00. The appellant's worth was meager by comparison. It seems to us in a case such as this where the wife has contributed to the accumulation of the property of her husband, doing her part as a housewife, it would not be improper that she be allowed a reasonable amount as lump-sum alimony on retrial.
278 So.2d at 449.
Miller v. Miller, 298 So.2d 704 (Miss. 1974), is also important. In Miller the Court commented that:

*584 This theory as to the wife's lowly position has been eroded not only by the passage of time but also by the enlightenment of people generally. In this country and throughout the civilized world in the present day such an idea may be said to have a strictly limited validity and application, if it continues to have any at all.
298 So.2d at 707.
The viability of this rule was recognized in Reeves v. Reeves, 410 So.2d 1300, 1302-03 (Miss. 1982). The Court in Reeves, while hesitant to adopt the concept of equitable distribution altogether, did recognize that a "substantial" lump-sum alimony award may be granted to a contributing spouse where title to the accumulated assets are beyond the power of the court to convey. The Court also endorsed the broad definition of "contribution" (i.e. one encompassing housekeeping) that had previously been adopted in Jenkins.
Pickens v. Pickens, 490 So.2d 872 (Miss. 1986), affirmed a chancellor's equitable division of an unmarried couple's real and personal property and proceeds upon a similar theory.
The rule that homemaking contributions may not justify an equitable division of real property cannot be justified as an original proposition. Neither is there a policy reason why we would want to maintain such a rule. It is among those rules that calls to mind Holmes' familiar quote:
It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.
The Path Of The Law, 10 Harv.L.Rev. 457, 469 (1897).
ROBERTSON and ZUCCARO, JJ., join this opinion.
NOTES
[1] A schedule of the properties, together with their assessed value as ascertained from the record, is attached.
[2] The final judgment entered July 29, 1986, directed, inter alia,

4. That the Defendant, Fred Milton Jones, shall within thirty (30) days of the date of this Order, execute all deeds and documents necessary to vest a two-fifths (2/5) undivided interest in and to the real property hereinabove described as Parcels One through Six in the Plaintiff, Eunice Rebecca Lucius Jones. That the Defendant, Fred Milton Jones, shall within thirty (30) days of the date of this Order, execute all deeds and documents necessary to convey all of his right, title and interest in and to the real property hereinabove described as Parcels Seven through Nine in the Plaintiff, Eunice Rebecca Lucius Jones. In the event said deeds and documents are not executed within the aforesaid period of time, then the Chancery Clerk of Rankin County is hereby appointed as Special Commissioner and directed to execute the same as the act and deed of the Defendant, Fred Milton Jones.
[1] This rule is compatible with the typical situation where the homemaker is the female spouse. Equal protection would provide the same consideration for "Mr. Mom" situations. (Mr. Mom was a popular movie comedy where the husband did the house management while the wife worked.)
[2] Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Texas and Washington.
[3] Thirty-nine by statute. Two (Florida, South Carolina) by judicial decision. Parrott v. Parrott, 278 S.C. 60, 292 S.E.2d 182 (1982); Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980). 21 Fam.L.Q. 417, 453-54 (1988), McCahey, John P. Valuation & Distribution of Marital Property, § 3.01 (1988).
[4] 21 Fam.L.Q. Ibid. (above); McCahey, Ibid.