557 So.2d 480 (1989)
Martha Lynn WHITE
v.
Dudley Hearn WHITE.
No. 07-59457.
Supreme Court of Mississippi.
December 20, 1989.
Barry W. Gilmer, Gilmer Law Firm, Jackson, for appellant.
Richard E. Stratton, III, Brookhaven, for appellee.
Before ROY NOBLE LEE, C.J., and PRATHER and ANDERSON, JJ.
ANDERSON, Justice, for the Court:
After a four day hearing, February 22-23 and April 27-28, 1988, Martha Lynn White and Dudley Hearn White were *481 granted a divorce on June 7, 1988. The chancellor granted the divorce to the parties on the ground of habitual, cruel and inhuman treatment as proved by Mrs. White. Mrs. White appeals this judgment assigning five errors, only one of which has merit and requires that we reverse and remand. Mr. White cross assigns on six issues, five of which are responses to Mrs. White's assignments; however, these assignments are meritless, and they will not be discussed.
Mr. and Mrs. White were married on November 5, 1967. This was the second marriage for the parties, and each of them had children from the previous marriage; however no children were born as a result of this union.
Between the time of her first divorce and when she met Mr. White, Mrs. White held several jobs: clerk for the biology department at the University of Southern Mississippi for five to seven months; clerk for Dr. Willard Boggan for six to eight months; clerk/secretary/receptionist for Thurman Pitts Interior Decorators for nine months to a year; and library assistant at the Mississippi Law Library for approximately one year. She remained at the Law Library until the spring of 1968 when she quit her job at the request of her husband and began to assist him at his office.
While working with her husband, Mrs. White did clerical work and went with him to job sites and property inspections. In 1970 Mrs. White received her real estate license. This allowed her to sell real estate for her husband's real estate company, and a portion of her commission went to the company.
To further the development and promotion of the company, Mrs. White became active in the community  joining many organizations including the Jackson Yacht Club, Mississippi Art Association, and Jackson Symphony Orchestra Association. After recognizing the profitability of a multi-unit apartment complex, Mrs. White encouraged her husband to invest in this area of realty instead of single-family housing. Because of encouragement from his wife, Mr. White gradually moved into the multi-living units market instead of single-family housing. As a result Mr. White built the Briars apartment complex, which has a present market value of $1.8 million. Mr. White consulted his wife regarding the floor plans, and she selected the color schemes, draperies and carpets for the units. She also decorated the party room and community rooms.
In 1976, Mrs. White began employment as a realtor with Jim Lowe. While employed with Mr. Lowe for an eight-month period, she learned about the buying and selling of previously repossessed housing.[1] After working with Mr. Lowe, she encouraged her husband to shift gears once again, and they got involved in this market. Just as always, she assisted Mr. White with the redecorating of the kitchens and bathrooms.
In 1979, Mrs. White contributed to the design, planning and construction of their new residence on St. Andrew's Drive. She recognized the importance of allowing the community to see the quality of Dudley's work and to keep his name before the public. Consequently, she held their home out to the public and listed it on the DAR's list of tours.
From the inception of the marriage, Mrs. White constantly entertained Mr. White's business associates and was active in charitable functions in order to promote the business of her husband as a successful architect, builder and developer. As a matter of fact, this was one of the underlying reasons for moving to the more spacious house on St. Andrew's Drive. In addition, Mrs. White maintained the family's household and continued to do whatever her husband wanted her to do. When Mr. White's health began to fail in the last years of their marriage, Mrs. White assumed the roles of nurse, driver and companion, and she constantly strived to keep Mr. White as active as his health would permit.
The parties enjoyed a harmonious marriage until June 16, 1986, when Mr. White *482 without provocation attacked Mrs. White with a steel claw hammer. As a result of this attack, Mrs. White required stitches.
Testimony indicates that on that morning Mr. White rose early, and as Mrs. White was reading while lying on the couch, he approached her from behind and attacked her with the hammer. As a result of the attack, Mrs. White's medical conditions have worsened. These conditions include: constant problems with her colon, nervousness, headaches and insomnia. Although Mr. White attacked her, Mrs. White has forgiven him and describes Mr. White as a "wonderful human being ... a marvelous person, and the scariest thing about the incident was that it was totally out of character."
The defendant/cross appellant maintains that he does not remember striking Mrs. White, but he also indicates that he was provoked by her because of her purchase of a condominium. And, although he believed that she spent more money than was necessary, Mr. White intended that his wife is taken care of after his death. Furthermore, even though she occasionally denied him sexual privileges, failed to cook for him or go to Sunday School or church with him, she did not mistreat him, and she was basically good to him. Moreover, this did not create the problem as much as buying the condo had created. As a matter of fact, they would still be together, but for that purchase.
Now that we have provided a collection of some of the testimony provided at trial, it is appropriate to examine the facts pertinent to discuss the assignment for which we reverse and remand.

PROPOSITION I
Whether The Award To Martha Lynn White In The Form Of Gross Or Lump Sum Alimony In The Sum Of Fifty Thousand Dollars ($50,000.00) Or Three Point Three Percent (3.3%) Of The Estate Of Dudley Hearn White Was So Inadequate As To Constitute An Abuse Of Discretion By The Chancellor
Prior to the marriage, Mrs. White's total assets equaled approximately $12,819; however, this amount increased to $509,077 by December 1987. During this same time period, Mr. White's assets increased from $586,092 in 1967 to $1,175,104 in 1987. There is also evidence that the present value of Mr. White's estate is in excess of $1.5 million. Suffice it to say, the White's assets substantially increased during their marriage.
At the time of trial, Mr. White was 78 years old and suffered from Parkinson's disease. He has a life expectancy of seven years and eight months. He receives $1,199.10 per month in Social Security Benefits. His net annual cash receipts are $50,659 or an average monthly income of $4,221.48. In addition, his necessary monthly expenses are $2,363.50 which leaves $1,858 for extras, contingencies, and periodic alimony payments. However, his assets are capable of producing an income up to $8,300 per month.
On the other hand, Martha Lynn White is 61 years of age and has a life expectancy of 21 years and 10 months. According to her testimony the fair market value of her gross estate is $304,118; however, Mr. White contends that her gross estate is worth more. Included in this total is rental income of $1,000 per month from her home on St. Andrew's Drive. Beginning November 1988, Mrs. White began receiving $453 a month in Social Security benefits until Mr. White's death. At that time the payments would increase to $1,199.10 as survivor benefits. When these figures are multiplied by her life expectancy, Mrs. White would collect $242,352 during her lifetime. However, in her brief to this Court, Mrs. White maintains that her estate is principally comprised of jewelry, household goods and furnishings, clothing and the two residences, one of which is presently offered for sale to the general public and has a large indebtedness associated with it. Moreover, Mrs. White does not have a car, but she uses one provided by a friend. Her monthly expenses are approximately one-half of the estimated amount that the couple spent while married.
*483 After reviewing this testimony the chancellor concluded that Mrs. White was entitled to $50,000 lump sum alimony. Because there is conflicting evidence and testimony concerning the parties' worth and expenses, the trial judge's findings of fact are extremely important. Cf. Gavin v. State, 473 So.2d 952, 955 (Miss. 1985) (it is essential that we have from our trial courts findings of fact upon which we may rely). Where findings of fact are made by a chancellor, they will not be set aside or disturbed on appeal unless manifestly wrong. See, Smith v. Smith, 545 So.2d 725, 727 (Miss. 1989); Carr v. Carr, 480 So.2d 1120, 1122 (Miss. 1985). During this hearing there was a plethora of evidence  fourteen witnesses took the stand, the record consumed five volumes, and fifty-one exhibits were admitted. Of course there was conflicting evidence, but because this judgment is without sufficient findings of fact, we must proceed accordingly.

DISCUSSION OF LAW
The most recent case this Court has decided concerning lump sum alimony is Cheatham v. Cheatham, 537 So.2d 435 (Miss. 1988). In that case the Court explained that there are several factors to consider in awarding lump sum alimony:
(1) Substantial contribution to accumulation of total wealth of the payor either by quitting a job to become a housewife, or by assisting in the spouse's business. Tutor v. Tutor, 494 So.2d 362 (Miss. 1986); Schilling v. Schilling, 452 So.2d 834 (Miss. 1984).
(2) A long marriage. Jenkins v. Jenkins, 278 So.2d 446, 449 (Miss. 1973); Tutor and Schilling, supra.

(3) Where recipient spouse has no separate income or the separate estate is meager by comparison. Jenkins, supra; Tutor, supra; and Schilling, supra.

(4) Without the lump sum award the receiving spouse would lack any financial security. Abshire v. Abshire, 459 So.2d 802, 804 (Miss. 1984).
A closer analysis of the cases, however, reveals that the single most important factor undoubtedly is the disparity of the separate estates.
537 So.2d at 438.
First, in applying these factors to the case sub judice, there is no doubt Mrs. White substantially contributed to Mr. White's accumulated wealth. Six months after their marriage in 1967, Mrs. White resigned from employment with the State Law Library at the request of her husband to assist him in the operation of his real estate business. She was able to contribute more after she received her license to sell real estate. According to Mrs. White, fifty-percent of her commissions earned from her sales was contributed to her husband's business.
As a result of her studies, Mrs. White realized the need for multi-unit apartments in Northwest Jackson. Because of his wife's encouragement, Mr. White built the Briars apartment complex. Mrs. White contributed her part by aiding in the design of the kitchens and bathrooms and selecting the interior decorations for the complex.
In 1976 Mrs. White obtained employment as a realtor with Jim Lowe. But, she did not remain long because her husband again asked her to quit because Lowe was his competitor. Through her employment with Lowe Realty, Mrs. White realized the potential profit in the resale of previously re-possessed real estate. She encouraged her husband to get involved in those prospects. Again, she assisted Mr. White with the design of the kitchens and bathrooms of these complexes as well.
Some of the above testimony by Mrs. White has been undercut by testimony elicited by appellee/cross appellant. For example, Peter Daschbach testified that Mrs. White only tried to get involved in planning, design and decoration of the Briars apartments. Moreover the only suggestion that the architects entertained was her suggestions concerning the light fixtures. In addition, Mr. White's son, a 20% shareholder in the corporation, testified that Mrs. White was never engaged in the business of the company. She had never received a salary for her work nor were there any *484 W-2 forms to prove that she had been employed by the company. Furthermore, the son maintained that it was his idea to engage in apartment complex development, and Mrs. White had nothing to do with the design, construction or decorating of the repossessed homes.
Even if the appellee's testimony is true, it is unquestionable that Mrs. White promoted her husband's business through her home and social life. She constantly entertained Mr. White's business associates and was active in many community and charitable organizations in order to promote her husband's business. Her role was best described by Jim Lowe: "[s]he was the hub of the situation ... and was the one who carried off the entertaining... ."
During all of this, Mrs. White still remained the ever-dutiful, loving and devoted wife. She assumed all of the duties associated with running the family's household. And, when Mr. White's health began to fail in the last years of their marriage, Mrs. White cheerfully assumed the roles of nurse, driver and companion, while constantly striving to keep Mr. White as active as his health would permit. It is obvious that Mrs. White has complied satisfactorily with the first factor in Cheatham. Now we must look to the other factors as announced in Cheatham, supra.
The second factor is the length of the marriage of the parties. The Whites were married for 19 years. The separation of the parties was a direct result of "Mr. White's attempt to kill Mrs. White." This Court has allowed longer marriages to be dissolved, see, Tutor v. Tutor, 494 So.2d 362, 363 (Miss. 1986); as well as shorter marriages, see e.g., McNally v. McNally, 516 So.2d 499, 500 (Miss. 1987).
The third point considers the separate incomes of the divorcing parties. Mrs. White puts her estate at $300,000.00 while her husband puts that figure at approximately $500,000.00. Additionally, her estate is burdened with a substantial debt. In any event it is substantially less than her husband's net worth.
The fourth point concerns whether the receiving spouse would lack any financial security. Although, it is apparent that even without the lump sum award, Mrs. White would not lack financial security, she, nonetheless, is entitled to a share of the accumulated wealth because throughout their marriage she contributed something to it. See, e.g., Cheatham, 537 So.2d at 439 (citing Tutor v. Tutor, 494 So.2d 362 (Miss. 1986), for the proposition that a spouse who contributes something to the marriage is entitled to a share of the accumulated assets).
As stated previously the most important consideration is the disparity of the estates. In comparing the estates of the two parties  though a difficult task because the trial court made no findings of fact  Mrs. White's estate is substantially less than her husband's. Her testimony indicates that her gross estate has a fair market value of approximately $300,000. This estate is principally comprised of jewelry, household goods and furnishings, clothing and two residences, one of which is presently offered for sale and has a large indebtedness associated with it. She does not own a car. Her sources of income are her monthly social security benefits, monthly alimony check and the rental income from the former marital domicile.
Even if we use the higher figure that the appellee suggests, Mrs. White's estate still would be substantially less than her husband's. Moreover, Mr. White's estate is capable of producing an income up to $8,300 per month. Therefore, based on the above, an award of the lump sum alimony was not an abuse of discretion. The appropriateness of the amount of the lump sum alimony, however, is a totally separate issue. Cheatham, 537 So.2d at 439.
A divorcing spouse who has assisted his wife or her husband in the accumulation of wealth during the marriage as reflected by an increase in net worth may be awarded lump sum alimony reflecting an equitable portion of the increase. See, Jones v. Jones, 532 So.2d 574 (Miss. 1988); Skinner v. Skinner, 509 So.2d 867 (Miss. 1987); Reeves v. Reeves, 410 So.2d 1300 (Miss. 1982); Jenkins v. Jenkins 278 So.2d 446 (Miss. 1973). Moreover, a substantial *485 lump sum award of alimony is similarly appropriate where the husband has accumulated considerable property and the wife has contributed by doing her part as a housewife. Jenkins, supra; Jones, 532 So.2d at 581 (Prather, J., concurring).
For some guidance as to how much lump sum alimony is appropriate, a look at some cases previously decided is appropriate. In Schilling v. Schilling, 452 So.2d 834, 836 (Miss. 1984), this Court made it clear that ten percent of the husband's net estate could neither establish a ceiling nor a floor on the amounts to be awarded in all cases. The wife in Schilling had no substantial assets of her own and had quit her own job to assist her husband in pursuit of his professional aspirations. Id. at 834. In addition the chancellor found that Mr. Schilling's net worth was at least $750,000 consisting of holdings, stocks, oil production and real estate and the wife had made a very substantial contribution to his financial condition. On appeal this Court affirmed a lump sum award which represented roughly 33% of her husband's net worth.
Likewise, in Tutor v. Tutor, the husband had substantial interests in two banks, an investment company and at least three other corporations. 494 So.2d 362, 363 (Miss. 1986). This, added to his other assets, gave him a net worth between $900,000 and $1,488,000. Id. at 365. This Court increased the lump sum award on appeal from $50,000 to $150,000, a figure representing approximately ten per cent of the husband's net worth. This was done in light of the fact that Mrs. Tutor had no substantial assets other than her husband's valuable coin collection and a $20,000 insurance policy. See Cheatham, 537 So.2d at 438. Amounts equalling ten percent of the husband's net worth have been awarded to the wife in other cases as well. See, e.g., Abshire v. Abshire, 459 So.2d 802 (Miss. 1984); Skinner v. Skinner, 509 So.2d 867 (Miss. 1987); and Reeves v. Reeves, 410 So.2d 1300 (Miss. 1982). However, in none of these cases did this Court state that ten percent is the optimum award. As a matter of fact, the notion that it is not the optimum is made clear in Schilling, 452 So.2d at 836.
This point is clearly evidenced by our decision in Jones v. Jones, where we refused to disturb a chancellor's decisions making an equal division between the husband and wife. 532 So.2d at 578, 580-81. In Jones this Court adopted the language of Pickens v. Pickens, 490 So.2d 872, 876 (Miss. 1986), in justifying the 50-50 equitable distribution:
In determining what is an equitable division, the chancellor is by no means limited to an [sic] consideration of the earnings of the parties and cash contributions made by each to the accumulation of properties. As any freshman economics student knows, services and in kind contributions have an economic value as real as cash contributions. In such situations, where one party to the relationship acts without compensation to perform work or render services to a business enterprise or performs work or services generally regarded as domestic in nature, these are nevertheless economic contributions. [citation omitted]. They are to be valued by reference to the cost of similar services in the market place.
532 So.2d at 580 (emphasis added).
Based on this language and the evidence presented at trial, the trial court abused its discretion in limiting the lump sum to $50,000. The evidence demonstratively showed the substantial increase in wealth attained during the course of the Whites' marriage. Mrs. White's contributions to the marriage and promotion of Mr. White's business were worth substantially more. Moreover, Mrs. White quit two jobs to assist in her husband's business, and she was very instrumental in the public relations aspect of the business.
In conclusion, Mrs. White's contributions to the marriage were worth more than $50,000. Just how much more should be determined on remand. The chancellor should be more diligent in his findings of fact in addressing the issues delineated above in determining the amount of increase in the lump sum amount.
REVERSED AND REMANDED.
*486 ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN and BLASS, JJ., concur.
DAN M. LEE, P.J., and PITTMAN, J., not participating.
NOTES
[1] Lowe testified that Mrs. White worked for him for six weeks, but the parties do not point to this major discrepancy anywhere in the briefs.