# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 97-CA-00100-SCT

*FREDERICK RENNIE*

*v.*

*BARBARA E. RENNIE*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/20/96 |
| TRIAL JUDGE: | HON. JASON H. FLOYD, JR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | W. EUGENE HENRY |
| ATTORNEY FOR APPELLEE: | PATRICIA CHAMPAGNE |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 7/23/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 8/17/98 |

**BEFORE PITTMAN, P.J., McRAE AND MILLS, JJ.**

**MILLS, JUSTICE, FOR THE COURT:**

### STATEMENT OF THE CASE

¶1. On December 20, 1996, Chancellor Jason Floyd granted Barbara Rennie's petition for divorce. He ordered Frederick Rennie to pay $446.00 per month for support of the Rennies' only child, Heather. He also awarded Barbara Rennie a 32% interest in the retirement income that Frederick Rennie received from the United States Government for his service in the United States Air Force. Aggrieved, Frederick Rennie appeals assigning the following issues as error:

I. WHETHER THE TRIAL COURT ERRED IN FINDING THAT HEATHER RENNIE WAS NOT EMANCIPATED BY LAW AT THE TIME OF THE HEARING.

II. WHETHER THE TRIAL COURT ERRED BY NOT ENFORCING THE PROPERTY SETTLEMENT AGREEMENT THE PARTIES HAD DRAWN UP IN CONTEMPLATION OF FILING FOR DIVORCE.

III. WHETHER THE TRIAL COURT ERRED IN AWARDING BARBARA RENNIE A

PORTION OF FREDERICK RENNIE'S RETIREMENT INCOME FROM THE UNITED STATES AIR FORCE.

## STATEMENT OF THE FACTS

¶2. Frederick and Barbara Rennie were married on March 3, 1972. In 1977, Barbara gave birth to the Rennies' only child, Heather. Frederick served in the United States Air Force from April 1965 until May 1987. From the time they were married until 1984 Barbara traveled with Frederick to different assignments and they lived as man and wife. In 1984 the couple resided in their own home in Long Beach, when Frederick was informed that he must do a tour of duty overseas and that he could either go to Europe or the Pacific area. Frederick chose Europe and was assigned to Germany. Barbara did not want to move to Germany and neither Frederick nor Barbara wanted to pull Heather out of the Long Beach school system. The couple decided that Barbara would stay in Long Beach with Heather. Frederick requested that he be reassigned to Keesler Air Force Base near Long Beach after his tour in Germany. While in Germany, Frederick would return four times a year for two to three days at a time to visit Barbara and Heather. Additionally, Barbara and Heather went to Europe twice to see Frederick. On one trip they visited Scotland, where Frederick had family, and on another occasion they visited Frederick in Germany. Barbara and Frederick did not engage in sexual relations on any of these visits.

¶3. Frederick's tour in Germany ended in 1986 and he was transferred to Whitman Air Force Base in Missouri. Frederick testified that he asked Barbara to join him in Missouri and she refused. At this point he informed her that if she did not move to Missouri with him, then the marriage was over. Barbara testified that Frederick was contemplating retiring in a year and that she did not want to move to Missouri for one year. Instead, Barbara stated that she preferred to stay in Long Beach and wanted Frederick to move back to Long Beach with them when he retired from the Air Force.

¶4. Once Frederick moved to Missouri the marriage began to rapidly deteriorate. Shortly after the move Frederick wrote to Barbara suggesting divorce. Though Frederick still periodically returned to Long Beach to visit Heather, he slept on the couch or in Heather's bed on these trips and she slept with her mother. Heather also regularly visited her father in Missouri. She returned from one of her visits to Missouri to inform Barbara that Frederick was living with another woman. Frederick testified that he did not begin cohabitating with the other woman until 1991, long after the Rennies had decided to divorce. Further, Frederick pointed out that a property settlement agreement which Barbara sent him provided that each party could carry on and conduct his or her private life as if he or she were unmarried. Frederick began paying $500 a month in child support in 1992. On January 2, 1996, Heather gave birth to an illegitimate child, Shane Cobern. Heather's boyfriend, Guy Cobern, affectionately known as Boogie, is Shane's father. In April 1996, Heather moved out of her mother's home and into an apartment with Boogie. Following Heather's move, Frederick reduced his child support payments to $250 per month. At this time, Boogie was working full time, and Heather was working part-time. Heather testified that during this absence from her mother's home, her mother provided some assistance by purchasing some items for Heather and Shane. After only three months on their own, Heather lost her job and she, Boogie, and Shane moved in with Barbara. In August 1996, Frederick stopped paying child support altogether. In September 1996, Heather and Boogie broke up and Boogie moved out. Heather and Shane still reside with Barbara. Heather testified that she has gotten her GED and is seeking a Pell Grant to attend college.

¶5. Frederick testified that after taxes, he brings home about $3500 per month. He stated that he draws $1650 each month from his military retirement pay and that he is currently employed as a systems analyst with CSDI, making $2,633 per month. Barbara testified that she is employed at the Grand Casino in Gulfport and that she has a gross income of $900 per month.

## STANDARD OF REVIEW

¶6. When reviewing a chancellor's decision this Court will accept the chancellor's finding of fact as long as the evidence in the record reasonably supports those findings. ***Perkins v. Thompson***, 609 So.2d 390, 393 (Miss. 1992). In other words, we will not disturb the findings of a chancellor unless those findings are clearly erroneous or an erroneous legal standard was applied. ***Hill v. Southeastern Floor Covering Co.***, 596 So. 2d 874, 877 (Miss. 1992). Where the factual findings of the chancellor are supported by substantial credible evidence, they are insulated from disturbance on appellate review. ***Jones v. Jones***, 532 So. 2d 574, 581 (Miss. 1988) (*citing **Norris v. Norris***, 498 So. 2d 809, 814 (Miss.1986); ***Carr v. Carr***, 480 So. 2d 1120, 1122 (Miss. 1985)).

## DISCUSSION

### I. WHETHER THE TRIAL COURT ERRED IN FINDING THAT HEATHER RENNIE WAS NOT EMANCIPATED BY LAW AT THE TIME OF THE HEARING.

¶7. The chancellor ordered Frederick to pay $446 per month in child support for Heather until she was self-sufficient or reached the age of 21. Frederick asserts that the chancellor erred in awarding child support because Heather is emancipated. Frederick advances that Heather is emancipated because she is no longer in school, she has a child with Boogie, she has lived with Boogie as man and wife, and she has held several part-time jobs averaging between twenty to thirty-five hours per week. Further, Frederick argues that Boogie's support of Heather and their child for a period of time, along with their discussion of marriage, and the fact that they signed a six month lease together all lend credence to his assertion that Heather is emancipated.

¶8. Barbara asserts that Heather has never been emancipated. The Mississippi legislature outlined when emancipation occurs in Mississippi Code Annotated § 93-5-23, stating:

> The duty of support of a child terminates upon the emancipation of the child.

> The court **may** determine that emancipation has occurred and no other support obligation exists when that child:

> (a) Attains the age of twenty-one years, or

> (b) Marries, or

> (c) Discontinues full-time enrollment in school and obtains full-time employment prior to attaining the age of twenty-one (21) years, or

> (d) Voluntarily moves from the home of the custodial parent or guardian, and establishes independent living arrangements and obtains full-time employment prior to attaining the age of twenty-one (21) years.

Miss. Code Ann. § 93-5-23 as amended in 1996 (emphasis added). The statutory language is not exclusive. The statute only defines when a court may find that a child is emancipated. Other situations, not contemplated by the statute, may also establish emancipation.

¶9. In *Caldwell v. Caldwell*, 579 So. 2d 543, 549 (Miss. 1991), we defined emancipation prior to the enactment of the correct statutory language as follows:

> Emancipation, as employed in the law of parent and child, means the freeing of a child for all the period of its minority from the care, custody, control, and service of its parents; the relinquishment of parental control, conferring on the child the right to its own earnings and terminating the parent's legal obligation to support it.

*Caldwell*, 579 So.2d at 549 (*quoting* *Pass v. Pass*, 238 Miss. 449, 454. 118 So.2d 769, 771(1960)). This judicial definition has been enlarged not diminished by the amended statute. When Heather Rennie moved into an apartment with Boogie she removed herself from her mother's care and control. Once she and Boogie set up house and had a child, she was no longer under Barbara or Frederick's control. She and Boogie were living together, supporting themselves and their child. Indeed, she and Boogie were liberated from parental control. Though Heather has now returned to Barbara's home and may very well be under Barbara's control, she has taken her bite from the apple. In *Crow v. Crow,* 622 So. 2d 1226 (Miss. 1993), we held that once a child is emancipated, child support is terminated forever. We opined that child support cannot be renewed once the situation creating emancipation no longer exists. *Crow*, 622 So. 2d at 1228. Since Heather voluntarily chose emancipation, she may not now revoke her irresponsible launch into adulthood. The chancellor erred when he ordered Frederick to renew his child support obligations for Heather.

## II. WHETHER THE TRIAL COURT ERRED BY NOT ENFORCING THE PROPERTY SETTLEMENT THE PARTIES HAD DRAWN UP IN CONTEMPLATION OF FILING FOR DIVORCE.

¶10. In 1992, Barbara Rennie retained attorney Faye Spayde to represent her in a divorce. Ms. Spayde prepared a proposed property settlement agreement, which she sent to Frederick on June 2, 1992. The agreement stated that Barbara was entitled to receive 50% of Frederick's retirement benefits. Frederick did not sign this agreement and informed Barbara that she was not entitled to any of his retirement benefits. On June 8, 1992, Barbara deleted the portion of the original property settlement asking for fifty percent of Frederick's retirement benefits, and sent Frederick a revised property settlement agreement. Ms. Spayde sent Frederick a letter with the revised agreement informing him that if he would sign the revised agreement and have it notarized, she would get Barbara to sign it and send him a copy. Frederick signed the agreement and mailed it back to Ms. Spayde. Frederick then called Ms. Spayde and told her that there were some portions of the agreement to which he objected. He had Ms. Spayde strike through these portions of the agreement. Barbara never returned to Ms. Spayde's office and never signed the revised agreement. Frederick now asserts that the chancellor erred in failing to enforce this unexecuted property settlement agreement.

¶11. Frederick's assertion is without merit. First, Barbara failed to sign the revised agreement. Frederick's cited authorities such as *Traub v. Johnson*, 536 So. 2d 25 (Miss. 1988), all concern

property settlement agreements signed by both parties. Further, nothing in the record suggests that Barbara would have agreed Frederick's proposed changes. Finally, no court approved this property settlement agreement. We have consistently held that property settlement agreements entered into in anticipation of divorce on the grounds of irreconcilable differences must be approved by the court to be enforceable. *Grier v. Grier* 616 So. 2d 337, 340 (Miss. 1993)(*citing **Sullivan v. Pouncey***, 469 So. 2d 1233 (Miss. 1985)). In the case *sub judice*, the property settlement agreement was drawn up in contemplation of a divorce on the grounds of irreconcilable differences in 1992. The couple never pursued this divorce and thus, no court ever had the chance to approve the property settlement. Instead, on January 24, 1996, Barbara filed for divorce on the grounds of irreconcilable differences or in the alternative cruel and inhuman treatment, and adultery. On August 26, 1996, Frederick filed a cross complaint for divorce on the grounds of irreconcilable differences or in the alternative, desertion. The property settlement agreement urged by Frederick was made in contemplation of a divorce in 1992, not the divorce that was actually obtained in 1996. Finally, one clause in the agreement stated, "...In the event said divorce action is not pursued to consummation this agreement shall become null and void." Further, in 1996, Frederick signed a consent to adjudication stating that he would allow the chancellor to determine: Barbara's interest in his military retirement benefits; Frederick's duty to pay child support; and Barbara's right to receive periodic alimony. Frederick's assertions to the contrary, the 1992 "agreement" has no application to the present action and the chancellor did not err in refusing to enforce its terms.

## III. WHETHER THE TRIAL COURT ERRED IN AWARDING BARBARA RENNIE A PORTION OF FREDERICK RENNIE'S RETIREMENT INCOME FROM THE UNITED STATES AIR FORCE.

¶12. Frederick next contends that the trial court erred in awarding Barbara thirty-two percent of his retirement income from the United States Air Force. He asserts that in order for Barbara to receive a portion of this asset, she must prove by a preponderance of the evidence that she helped acquire the asset. He argues that Barbara made no contribution to the acquisition of his retirement benefits from the Air Force.

¶13. Military retirement benefits are considered personal property and as such are subject to equitable division in a divorce proceeding. *Hemsley v. Hemsley*, 639 So. 2d 909, 914 (Miss. 1994). We have defined marital property as any property or assets acquired during the course of the marriage. *Hemsley*, 639 So. 2d at 915. In *Hemsley*, we noted that Mr. Hemsley's military retirement was accumulated during the course of his marriage and thus, was subject to equitable distribution. *Id.* at 913-14. Likewise, in the case *sub judice* at least part of Frederick's retirement was accumulated during his marriage to Barbara and therefore is subject to equitable distribution.

¶14. In *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994), we provided guidelines for chancellors to follow when dividing marital property. We directed chancellors to support their holdings with finding of fact and conclusions of law. *Ferguson*, 639 So. 2d at 928. The guidelines were enumerated as follows:

> 1. Substantial Contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:

> a. Direct or indirect economic contribution to the acquisition of the property;

b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and

c. Contribution to the education, training or other accomplishments bearing on the earning power of the spouse accumulating assets.

2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.

3. The market value and the emotional value of the assets subject to distribution.

4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;

5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;

6. The extent to which property may , with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and

8. Any other factor which in equity should be considered.

*Id.* at 928.

¶15. Frederick asserts that Barbara did not show that she contributed financially or domestically to their household and that she made no direct or indirect contribution toward the acquisition of his retirement income. He further argues that the chancellor erred in not making any findings of fact as to whether Barbara contributed to Frederick's military income.

¶16. The chancellor could have made a more extensive finding of fact in the record. However, the record indicates that the chancellor followed *Ferguson*. First, the record reflects that Barbara moved five times in twelve years in order to further Frederick's military career. These moves reflect that Barbara was willing to contribute to the harmony and stability of the marriage as well as to Frederick's accomplishments. One of their moves was to be closer to the University of Southern Mississippi so that Frederick could obtain his college degree. This move was certainly in furtherance of Frederick's accomplishments and career.

¶17. The record is silent as to who performed the household duties the first twelve years of the Rennies' marriage. The record does indicate that Barbara did not work during these twelve years, so it is safe to assume that since Barbara stayed home, she was Heather's primary care-giver during these years. In 1984, when Frederick was stationed in Germany Barbara was Heather's primary care giver and she maintained the marital home for Frederick's return. Additionally, Barbara and Heather made two trips to Europe to visit Frederick. Clearly, Barbara was contributing to the stability and harmony of the marriage at this time.

¶18. In addition to maintaining the home while Frederick was in Germany, Barbara was also employed outside of the home. During Frederick's two years in Germany, Barbara contributed to the family income by running a bait shop with her mother. The record does not reflect Barbara's income from the bait shop or the amount of her income spent on household expenses.

¶19. Frederick's argument that Barbara is not entitled to his retirement focuses solely on his argument that she did nothing to contribute to his retirement. Frederick fails to realize that this court has previously held that even if the husband is bringing in the income, marriage is a 50/50 partnership and property acquired during the marriage is considered marital property regardless of the role played by each partner. *Hemsley*, 639 So. 2d at 914.

¶20. Frederick also neglects to address any of the other *Ferguson* factors. Though most of the factors are not applicable to the case *sub judice*, factor number seven directs the chancellor to consider the parties' need for financial security in light of the combination of assets, income and earning capacity. The Rennies agreed that she would get the house in Long Beach and he would get all of their other property. When considering the income and earning capacity that Frederick and Barbara receive, we find that the chancellor made an equitable decision in awarding Barbara 32% of his retirement. Frederick's income is over three times that of Barbara's. His earning capacity is also greater because he has a college degree and Barbara does not. The chancellor did not award Barbara alimony, so a portion of Frederick's military retirement would be her only income besides the $900 a month that she earns working at the Grand Casino.

¶21. We also give weight to the fact that Barbara and Frederick were married for twenty-four years and for at least twelve of those years lived as man and wife. The chancellor noted that Frederick served in the Air Force for twenty-two years and that he and Barbara were married for fourteen of those years. Equity dictates that Barbara share in Frederick's retirement. Thus, we affirm the chancellor as to this issue.

## CONCLUSION

**¶22.** According to the definition of emancipation set forth by this Court in *Caldwell v. Caldwell*, 579 So. 2d 543, 549 (Miss. 1991), and consistent with the non-exclusive language of the statute, Heather became emancipated when she moved out of her mother's house to live with Boogie. Once a child is emancipated a father's obligation to continue child support ceases. *Crow*, 662 So. 2d at 1228. Thus, we reverse the chancellor's order compelling Frederick Rennie to pay child support.

¶23. We find Frederick's contention that the chancellor erred in not enforcing a four year old property settlement that Barbara Rennie never signed to be without merit. Further, we find that Barbara Rennie is entitled to thirty-two percent of Frederick Rennie's military retirement. For the following reasons, we reverse in part and affirm in part.

¶24. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, ROBERTS, SMITH AND WALLER, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY.**