# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 93-CA-01372-SCT

*THOMAS LANE TURPIN, SR.*

*v.*

*JIMMIE (IRWIN) LANGLEY TURPIN*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/19/93 |
| TRIAL JUDGE: | HON. MELVIN MCCLURE |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | SUSAN M. BREWER |
| ATTORNEYS FOR APPELLEE: | ROBERT P. CHAMBERLIN |
| | DEBRA PACE BRANAN |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 9/4/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 9/25/97 |

**EN BANC.**

**ROBERTS, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. After eleven years of marriage, on November 19, 1994, Jimmie Irwin Langley Turpin was granted a divorce from Thomas Lane Turpin on the grounds of habitual, cruel and inhuman treatment.[1] The DeSoto County Chancery Court awarded the parties' marital home and indebtedness to Jimmie, and awarded to Thomas his dentistry office and indebtedness. Further, Thomas was ordered to pay Jimmie $55,000 and pay half of their joint credit card indebtedness after deducting Jimmie's individual debt of $7,500. However, Thomas retained the rights to his $160,000 retirement account and $60,000 Franklin stock account. Given the parties contributions to the marriage, the chancellor's decision in awarding the divorce, and the parties respective estates, it does not appear that the chancellor committed manifest error in his property division.

¶2. Aggrieved by the chancellor's division of property, Thomas perfected his appeal requesting review of the following two issues.

**I. WHETHER THE TRIAL COURT ERRED IN ORDERING DR. TURPIN TO PAY MRS. TURPIN FIFTY-FIVE THOUSAND DOLLARS AS PROPERTY SETTLEMENT?**

**II. WHETHER THE TRIAL COURT ERRED IN REQUIRING DR. TURPIN TO PAY APPROXIMATELY FOUR THOUSAND SEVEN HUNDRED FIFTY DOLLARS TOWARD THE JOINT VISA ACCOUNT?**

## STATEMENT OF THE FACTS

¶3. Thomas and Jimmie were married on November 17, 1981. Although married for approximately for eleven and one half years prior to their final separation, the parties had twice separated, and had lived apart for an aggregate of three and one half years. On February 16, 1993, Thomas filed for divorce and charged that he had been subjected to cruel and inhuman treatment by Jimmie.

¶4. Jimmie counter claimed against Thomas seeking the same. Jimmie subsequently amended her countercomplaint to request alimony and an equitable interest in Thomas' dental clinic. Thomas thereafter amended his complaint for divorce to request that all real property be sold, and the equity divided according to the parties' respective interest. Finally, Jimmie filed a second amended counter complaint requesting the court to divest title to their real property owned by the parties, as well as an equitable division of Thomas' retirement funds.

¶5. Trial was held on November 10, 1993, in the Chancery Court of Desoto County, Mississippi before the Honorable Chancellor Melvin McClure. At the time of trial, Thomas was 65 years old and Jimmie 60. Jimmie testified that she was sought a divorce from Thomas because of his severe drinking problem which caused him to be physically and verbally violent. Also, Jimmie sought an equitable division of Thomas' deferred compensation retirement plan and his Franklin Fund Account with values of $160,000.00 and $60,000.00 respectively. Most of the testimony, and the issues now on appeal, concerned money. The record is replete with how money changed hands and who bought and got what during the marriage with which funds.

¶6. The following is a breakdown of the flow of finances between the parties during their eleven-year marriage involving a three and a half year time of separation in the interim.

¶7. Jimmie testified to the following:

Jimmie asserted that she paid $23,000 of her own money to buy Thomas' prior wife's interest in Thomas' wife's and his previous marital home at 8188 Danforth Lane in Germantown.

Thomas and Jimmie sold Danforth and netted $61,000.

The $61,000 was spent as follows: (1) $21,000 was used as a down payment on the Stonehedge property; (2) $17,000 was used as a down payment on a dental clinic in Horn Lake for Thomas; (3) $23,000 was put in a Tunica Bank by Thomas which whereabouts are unknown.

Jimmie uses part of $23,000 to buy drapes for home before Thomas took her off of his office account.

Jimmie and Thomas sell the Stonehedge property and each got a $12,500 check and Thomas gave Jimmie his share which she put in Boatman's Bank.

Jimmie and Thomas buy Wedgewood property for $119,000 because of her real estate connections, but valued at $137,000, $89,000 owed on mortgage after Thomas put $24,000 down as down payment from his retirement account.

Jimmie came to marriage with $50,000 of own money and now $25,000 of that is from the Stonehedge sale.

Jimmie accidently got $5,200 of Thomas' retirement fund which she used to pay house notes.

Thomas sells his Tunica office and gets $30,000.

Jimmie and Thomas dispute over the value of the house furnishings, she says they're worth $13,500 and he says they're worth $60,000.

Jimmie denies having stolen $2,400 from Thomas' office.

Jimmie claims to have worked for nine months for Thomas without pay.

Jimmie used their joint credit card to pay Stonehedge house notes for nine months.

Jimmie pays the taxes and insurance on the home during a separation period, $498.

Jimmie pays an unknown amount to one of her attorney with Thomas' clinic funds and paid another attorney $7,500 for a prior divorce.

Jimmie owes $1,500 on her personal Visa Credit Card.

Jimmie brought $2,000 of crystal into marriage and sold personal furniture for $2,000.

Jimmie drafted the contract and handled the sale of Thomas' Tunica clinic for $30,000 but yet did not get a commission.

Jimmie paid the mortgage of $1,500 per month for 7 mo.; $2,400 for extra light fixtures, and $7,000 for curtains. Thomas paid the $950 mo. note on clinic property.

Jimmie gave up profitable real estate business to move to Mississippi.

Jimmie has $3,000 in personal IRA.

¶8. Thomas testified to the following finances:

Thomas claimed Jimmie stole his $6,000 cash casino winnings from their home.

Thomas claims he paid Jimmie $1,000 per month for six months for working in his office, allowed Jimmie to have free rein of his checkbook to buy home furnishings and such, paid for her face lift, and had her teeth capped.

Thomas has a retirement account valued at approximately $160,000 and receives $2,600 per

month he now draws his retirement from it; he gets $197.50 per month from social security.

Thomas and Jimmie each paid half of the $23,000 used to buy his ex-wife's remaining interest in the house.

Thomas received $30,000 from the sale of his Tunica office.

Thomas has $60,000 in a separate Franklin account and has $3,000 in savings in the New South Bank.

¶9. Also, Thomas testified that before taxes, he withdraws $2,600 per month from his retirement plan. Thomas stated that the chancellor should not consider the values of the two retirement plans because most of the money was accumulated from his dentistry practice prior to marriage. However, the dates reveal that the plan was begun in 1977, and they were married in 1981 with the divorce following in 1993.

¶10. Thomas testified that he suffered a stroke which resulted in partial paralysis of his extremities and that he is unable to work and now has a fixed income of approximately $3,700 per month which after meeting his financial obligations leaves him with about $1,000 a month as living expenses. Jimmie testified that she will be able to continue to work in real estate and support herself.

¶11. Upon hearing all of the testimony and evidence introduced during the trial, Chancellor McClure granted Jimmie a divorce from Thomas on the grounds of habitual cruel and inhuman treatment. Chancellor McClure entered the written order on November 19, 1993.

¶12. The lower court divested from Thomas to Jimmie title of their present home located in Olive Branch, Mississippi. Title was also divested from Jimmie to Thomas of the Horn Lake property used as Thomas' dental clinic. Each were to assume any remaining indebtedness on their respective properties following the divorce respectively holding each other harmless for any such indebtedness. The value of Jimmie's property was $137,000 and its indebtedness was $89,000. Thomas' dentistry clinic was valued at $109,000 and its indebtedness was approximately $67,000. Thomas was awarded his retirement fund and Franklin account totaling approximately $220,000 free of any claim by Jimmie.

¶13. In addition to the division of real property, each were awarded their respective personal property in their possession including cash and cars. However, Jimmie was awarded, but not as alimony, "a property settlement in the amount of fifty-five thousand dollars ($55,000). It will be payable at the rate of one thousand dollars ($1,000) before the 31st of this month, and the balance paid out at one thousand five hundred dollars ($1,500) a month for thirty six months." Additionally, a $17,000 credit card debt was evenly divided ($4,750 each) after $7,500 was taken off the top and required to be paid by Jimmie as the $7,500 was a debt attributable to attorney's fees she incurred in her prior divorce. Finally, each were held responsible for their own debts and attorney's fees for this case, and Thomas was assessed court costs. All other relief, including Jimmie's alimony request, was denied.

## DISCUSSION OF ISSUES [2]

## I. WHETHER THE TRIAL COURT ERRED IN ORDERING DR. TURPIN TO PAY

**MRS. TURPIN FIFTY-FIVE THOUSAND DOLLARS AS PROPERTY SETTLEMENT?**

**II. WHETHER THE TRIAL COURT ERRED IN REQUIRING DR. TURPIN TO PAY APPROXIMATELY FOUR THOUSAND SEVEN HUNDRED FIFTY DOLLARS TOWARDS THE JOINT VISA ACCOUNT?**

¶14. As this Court stated in *Magee v. Magee,* 661 So. 2d 1117, 1122 (Miss. 1995):

Our scope of review in domestic relations matters is limited by our familiar substantial evidence/manifest error rule. *Stevison v. Woods*, 560 So.2d 176, 180 (Miss.1990). "This Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Bell v. Parker*, 563 So.2d 594, 596-97 (Miss.1990). *See also Ferguson v. Ferguson*, 639 So.2d 921 (Miss.1994); *Faries v. Faries*, 607 So.2d 1204, 1208 (Miss.1992). In other words, "[o]n appeal [we are] required to respect the findings of fact made by a chancellor supported by credible evidence and not manifestly wrong." *Newsom v. Newsom*, 557 So.2d 511, 514 (Miss.1990). *See also Dillon v. Dillon,* 498 So.2d 328, 329 (Miss.1986). This is particularly true in the areas of divorce, alimony and child support. *Tilley v. Tilley*, 610 So.2d 348, 351 (Miss.1992); *Nichols v. Tedder*, 547 So.2d 766, 781 (Miss.1989). The word "manifest", as defined in this context, means "unmistakable, clear, plain, or indisputable." *Black's Law Dictionary* 963 (6th ed. 1990).

. . . .

In *White v. White*, 557 So.2d 480, 483 (Miss.1989), we listed several factors to be considered by the chancellor in determining whether or not to award lump sum alimony and the amount of the award. These factors, commonly referred to as the "Cheatham" factors, are also found in *Cheatham v. Cheatham*, 537 So.2d 435, 438 (Miss.1988). Additionally, a spouse who has made a material contribution toward the acquisition of an asset titled in the name of the other spouse may claim an equitable interest in such jointly accumulated property. *Jones v. Jones*, 532 So.2d 574, 580-81 (Miss.1988).

*Magee v. Magee,* 661 So. 2d 1117, 1123 (Miss. 1995)

In reviewing the chancellor's decision, we are constrained by the rule that "[i]n the case of a claimed inadequacy or outright denial of alimony, we will only interfere where the decision is seen to be oppressive, unjust or grossly inadequate so as to evidence an abuse of discretion." *Monroe v. Monroe*, 612 So.2d 353, 357 (Miss.1992).

*Magee v. Magee,* 661 So. 2d 1117, 1124 (Miss. 1995)

¶15. As was stated in *Draper v. Draper* 627 So. 2d 302, 304, 305 (Miss. 1994):

A chancellor's decision will not be reversed if the finding of fact is supported by substantial credible evidence in the record. *Hammett v. Woods*, 602 So.2d 825, 827 (Miss.1992) (citing *Clark v. Myrick*, 523 So.2d 79, 80 (Miss.1988)). "This Court will not disturb those findings, unless manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Faries v. Faries*, 607 So.2d 1204, 1208 (Miss.1992) (citing *Hill v. Southeastern Floor Covering Co.,*

596 So.2d 874, 877 (Miss.1992)). It is well-established by this Court that the chancery court has the authority to order an equitable division of property that was accumulated through the joint efforts and contributions of the parties. ***Brown v. Brown***, 574 So.2d 688, 690 (Miss.1990). However, there is no automatic right to an equal division of jointly-accumulated property, but rather, the division is left to the discretion of the court. Id. at 691.

The chancellor in a divorce case now has the authority to divest title from one spouse, and vest it in the other spouse, when equitably dividing the marital assets.

¶16. Additionally, as the Court stated in ***Ferguson v. Ferguson***, 639 So. 2d 921, 930 (Miss. 1994) (emphasis added):

Property division should be based upon a determination of fair market value of the assets, and these valuations should be the initial step before determining division. Therefore, expert testimony may be essential to establish valuation sufficient to equitably divide property, particularly when the assets are as diverse as those at issue in the instant case. All property division, lump sum or periodic alimony payment, and mutual obligations for child support should be considered together. "Alimony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement of divorce. Therefore, where one expands, the other must recede." ***LaRue***, 172 W.Va. 158, 304 S.E.2d at 334 (Neely, J., concurring). Thus, the chancellor may divide marital assets, real and personal, as well as award periodic and/or lump sum alimony, as equity demands. To aid appellate review, findings of fact by the chancellor, together with the legal conclusions drawn from those findings, are required. In the final analysis, all awards should be considered together to determine that they are equitable and fair. Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." ***Bell v. Parker***, 563 So.2d 594, 596-97 (Miss.1990). In other words, "[o]n appeal this Court is required to respect the findings of fact made by a chancellor supported by credible evidence and not manifestly wrong." ***Newsom v. Newsom***, 557 So.2d 511, 514 (Miss.1990). This is particularly true "in the areas of divorce and child support." ***Nichols v. Tedder***, 547 So.2d 766, 781 (Miss.1989). "We have long recognized that, incident to a divorce, the Chancery Court has authority, where the equities so suggest, to order a fair division of property accumulated through the joint contributions and efforts of the parties." ***Brown v. Brown***, 574 So.2d 688, 690 (Miss.1990). In ***Draper***, 627 So.2d at 305, this Court held that the chancery court has authority to effect the divesting of title to real estate to achieve an equitable distribution of marital assets. This is a matter committed to the discretion and conscience of the court, having in mind all of the equities and other relevant facts and circumstances. ***Bowe v. Bowe***, 557 So.2d 793, 794 (Miss.1990). Moreover, the Chancery Court "has the authority to order an equitable division of jointly accumulated property and in doing so to look behind the formal state of title." ***Johnson v. Johnson***, 550 So.2d 416, 420 (Miss.1989).

¶17. With the aforementioned principles of law in mind, and applying the proper standard of review, there does not appear to be an issue before the Court in this case warranting reversal. The divesting and awarding of title to the two properties is clearly supported by ***Draper*** and appears to be equitable. The award of $55,000 and the $137,000 home with a $89,000 remaining mortgage to be paid by Jimmie appears to be equitable in light of the parties respective estates and contributions to

the marriage.

¶18. Both Jimmie and Thomas intermingled their separate money and property into their marital union. Although, Jimmie did not contribute as much money during the marriage, it is not sufficient to devalue the importance of her contributions. Thomas is left with a retirement account of approximately $160,000 and a separate stock account valued at approximately $60,000. Thomas is correct that Jimmie did not contribute to the balance of his retirement and stock accounts prior to marriage, however Thomas did not present any evidence to indicate the balance of his retirement and stock account prior to the marriage.

¶19. Although the chancellor did not make specific findings of fact to support his decision, this issue is without merit. Thomas has failed to show that the chancellor committed manifest error in awarding $55,000 to Jimmie.

¶20. As for the second issue surrounding the credit card debt, this appears without merit as well. The total debt for the jointly held and used credit card was $17,000. Seventy-five hundred was taken off the top and required to be paid by Jimmie as it was undisputably her debt alone. The card was jointly named and used up until the parties separated. Each were required to pay half of the remaining balance which does not appear to be a manifestly erroneous decision in light of the fact that an itemization of who spent what for whom on the remaining balance was not presented to the court.

## CONCLUSION

¶21. Although the chancellor did not make specific findings of fact to support his decision, there is sufficient evidence in the record to support the lower court's order. The record and testimony reflect that each party intermingled their separately earned property during their marriage. The record reflects that Jimmie spent substantial time working in the marital home and with her husband. Jimmie's contributions to the marriage will not be discounted solely because she did not meet Thomas' monetary contribution. Further, the chancellor did not err in ordering Thomas to pay $4750 toward the parties' joint credit card debt.

¶22. JUDGMENT IS AFFIRMED.

PRATHER AND SULLIVAN, P.JJ., PITTMAN, BANKS, SMITH AND MILLS, JJ., CONCUR. DAN LEE, C.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. McRAE, J., NOT PARTICIPATING.


DAN LEE, CHIEF JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:


¶23. While I agree with the majority as to the second issue on appeal, I must, after close review and consideration of this matter, respectfully dissent as to Issue I because the chancellor committed reversible error in his award of $55,000 to Jimmie Turpin. Perhaps the award was made in order to offset Dr. Turpin's retirement funds, which he was allowed to keep intact. This, however , is only sheer speculation, as the chancellor failed to provide any findings whatsoever on the matter of the

distribution of marital property. Assuming *arguendo* that this is what the chancellor did, a wife is not automatically entitled to an interest in her ex-husband's retirement funds. ***Armstrong v. Armstrong***, 618 So. 2d 1278, 1282 (Miss. 1993).

¶24. Jimmie Turpin did not "contribute to the acquisition" of all the retirement funds. The account was set up in 1977, and the Turpins were married in November of 1981. During the eleven and one-half years they were married, they were separated for at least three and one-half years. Jimmie Turpin is not entitled to a share of monies acquired with no contribution from her. ***Dillon v. Dillon***, 498 So. 2d 328 (Miss. 1986). Not only do I question Jimmie Turpin's contribution to the retirement funds, I also note that she held a sum of at least $50,000 in a separate account which she was allowed to keep in addition to the marital residence.

¶25. Additionally, the chancellor erred in his apparent failure to consider the physical and financial needs of Dr. Turpin. If the chancellor was attempting to provide equity, he failed. Equitable distribution does not necessarily mean equal division. ***Chamblee v. Chamblee***, 637 So. 2d 850, 863-64 (Miss. 1994). Jimmie Turpin is capable of working and caring for herself physically and financially. Dr. Turpin's stroke left him paralyzed and unable to perform many of life's daily tasks.

¶26. In light of Dr. Turpin's health and subsequent inability to maintain his career, and in light of Jimmie Turpin's ability to provide for herself, the chancellor's lump sum award of $55,000 to Jimmie severely limits Dr. Turpin's ability to cover his own living expenses and was grossly unfair, inequitable, and manifest error. ***Nichols v. Nichols***, 254 So. 2d 726, 727 (Miss. 1971).

¶27. Realizing the complex intertwining of funds this couple experienced during their marriage and in light of this Court's holdings in ***Chamblee*** and ***Melchios v. Melchios***, 607 So. 2d 1237 (Miss. 1992), I would reverse and remand for a complete evaluation of the marital and separate estates and a finding on the record, or in a final decree, of the evidentiary basis upon which the chancellor awarded the distribution of the funds.

1. The ground for the divorce is not appealed.

2. Both of the issues concern the propriety of the equitable division of assets amongst the parties. Thus, both are controlled by the same standard of review and are addressed together.