627 So.2d 302 (1993)
Douglas O. DRAPER
v.
Joan Davis DRAPER.
No. 91-CA-1260.
Supreme Court of Mississippi.
September 16, 1993.
Rehearing Denied December 16, 1993.
*303 Billy G. Bridges, Vicky F. Williams, Bridges & Williams, Brandon, for appellant.
Ricky L. Boggan, John H. Price, Jr., Price & Zirulnik, Jackson, for appellee.
En Banc.
JAMES L. ROBERTS, Jr., Justice, for the Court:
Douglas O. Draper and Joan Davis Draper separated on July 15, 1989, after almost twenty-eight years of marriage. After a two-day hearing, Joan was awarded a divorce on the ground of uncondoned adultery on November 20, 1991. Doug appeals to this Court assigning five errors, only one of which merits full discussion. We affirm the chancellor's decision on all issues.

I.
Joan and Doug Draper were married on December 16, 1961, in Nashville, Tennessee. Two children were born of the marriage, Nikki, born in 1963, and Mark, born in 1967. As both children are adults, neither support nor custody are issues in this case.
Joan and Doug have known each other since they were children in Nashville. They married the day after Joan graduated from the University of Tennessee with a B.S. degree in education. At the time of their marriage, Doug was still in school. While he completed the last quarter of his undergraduate degree, Joan was a substitute teacher. As that position was not bringing in very much income, she started to work at a bank in Knoxville in February, 1962.
Doug began graduate school in March, 1962. Joan continued working at the bank. Doug worked as a teaching assistant while he was in school. They continued to receive financial aid from both sets of parents for a period after their marriage. Joan quit work at the bank in November, 1962, due to her pregnancy with their first child. In September, 1963, Joan returned to the work force, this time as a teacher in the Knox County public schools. Doug was still in graduate school at this time. Joan continued to teach until sometime in the spring of 1967, when she again quit due to pregnancy and child-birth. Doug finished his doctorate in the spring of 1968. The couple moved to Jackson, Mississippi, after Doug graduated, and Doug began a post-doctoral fellowship at the University Medical Center. With Doug's approval, Joan stayed at home with their two children.
Around 1971, Doug decided to become qualified as a clinical psychologist, and began a year in an internship program. At the same time, Joan went back to teaching. Doug had a job at the hospital, but Joan was making a higher salary. Joan taught in the public schools in Terry, Mississippi, until June, 1976. Doug opened his private practice around 1972. In June, 1976, Joan again quit teaching with Doug's approval because their son was having trouble in school.
Joan did not return to work until September, 1983. At that time she volunteered as the manager of the sales gallery at the Mississippi Museum of Art. Doug approved of this work experience, even though Joan was not paid, because there were the possibilities of contacts and referrals for his business. Joan worked there for two years. In 1985, their son was attending an expensive school in Colorado and Joan stated that Doug wanted her to work at a paying job to help defray the costs of their son's school. Joan began *304 work at the Mississippi Arts Commission on November 1, 1985. After their son transferred to Mississippi State University in the fall of 1987, Joan quit her job at the Commission in March, 1988. Joan stated that she was unhappy because of the stress her job generated. Doug was grossing over $200,000.00 a year and Joan did not feel it was necessary for her to continue to work.
Doug did not approve of Joan's decision to quit her job. Joan testified that Doug told her that if she quit it would hurt their relationship, and that if she quit they would probably either get a divorce or have to sell the lot adjoining their home. Joan went back to school at Mississippi College and began working towards a master's degree in counselling.[1]
Joan was not employed at the time of trial, but had plans to seek employment upon completion of her degree and upon successfully passing the National Teachers' Exam, and in fact, had taken active steps to seek employment in the public school system. Doug, on the other hand, testified that his practice is "off" as a result of the divorce proceedings.
Doug became more dissatisfied with the marriage and asked for a divorce in February, 1989. However, Joan testified that she did not want the marriage to end. She wanted to work at saving their marriage and indicated she was willing to go to counselling. Joan stated that Doug refused to attend counselling sessions with her, declaring his mind made up about the divorce. Doug moved out of the marital home July 15, 1989. Joan testified that she continued to make efforts to save their marriage even after Doug moved out. Joan filed for divorce after learning of Doug's affair with Vesta Carter. The suit for divorce was filed October 26, 1990.
Doug complained that Joan's treatment of him was habitually cruel and inhuman because she smoked and refused to quit, she worked too many crossword puzzles, watched too much television, was unaffectionate toward him, and she seldom invited friends to their home. Moreover, Doug was displeased that Joan quit work. He felt that her working enriched their lives. Furthermore, Doug denied that his relationship with Vesta Carter had anything to do with the end of their marriage.
The Chancellor issued his judgment and opinion on November 20, 1991. The Chancellor granted Joan a divorce on the ground of uncondoned adultery, denying both parties' request for a divorce on the ground of habitual cruel and inhuman treatment. The Chancellor equitably divided the marital property, granting to Joan the title to all personal property in the family home (valued at $15,000.00); the title to the family home and adjacent lot (directing Doug to sign a warranty deed conveying said title, and directing Joan to assume and pay the first and second mortgages on the home); and $125,000.00 cash. Furthermore, the Chancellor directed Doug to maintain and pay all premiums on a life insurance policy on his life in the sum of $70,000.00, with Joan as the named beneficiary and owner of the policy. The Chancellor awarded Joan thirty-five per cent (35%) of the total value of Doug's retirement plan. Doug was also ordered to pay court costs and Joan's attorneys' fees. In addition, the Chancellor awarded Joan $4,200.00 a month in alimony.
Doug filed a Motion for a New Trial and Relief from Judgment on November 27, 1991. After a hearing on December 6, 1991, the Chancellor denied the Motion. Doug appeals to this Court.

II.
Our scope of review is limited in appeals from the Chancery Court. A chancellor's decision will not be reversed if the finding of fact is supported by substantial credible evidence in the record. Hammett v. Woods, 602 So.2d 825, 827 (Miss. 1992) (citing Clark v. Myrick, 523 So.2d 79, 80 (Miss. 1988)). "This Court will not disturb those findings, unless manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." Faries v. Faries, 607 So.2d 1204, 1208 (Miss. 1992) (citing Hill v. Southeastern Floor Covering Co., 596 So.2d 874, 877 (Miss. 1992)).
*305 Doug contends that since Mississippi continues to adhere to a "title theory" for property distribution in divorce cases, the lower court was not permitted to transfer property held in one party's name to that of another. The marital home and adjoining lot are jointly-owned by Doug and Joan. The retirement funds at issue were only in Doug's name.
It is well-established by this Court that the chancery court has the authority to order an equitable division of property that was accumulated through the joint efforts and contributions of the parties. Brown v. Brown, 574 So.2d 688, 690 (Miss. 1990). However, there is no automatic right to an equal division of jointly-accumulated property, but rather, the division is left to the discretion of the court. Id. at 691.
While it is a general rule of law that the chancery court cannot divest a spouse of title to property,[2] thereby forcing that spouse to deed such property to the other spouse, it is not an absolute rule. Watts v. Watts, 466 So.2d 889, 890 (Miss. 1985) (citing McCraney v. McCraney, 208 Miss. 105, 43 So.2d 872 (1950)). See also Jones v. Jones, 532 So.2d 574, 580 (Miss. 1988) ("Watts and its progeny have broadened the chancery court's authority to effect an equitable distribution of jointly accumulated property... ."). This Court has carved out exceptions to this general rule. Such an award can be made where it has been agreed to by the parties, or where the property has been acquired by the joint efforts of the parties. Watts, 466 So.2d at 890-891. This Court in Jones, 532 So.2d at 580, summarized the authority of the chancery courts in effecting an equitable distribution of marital property upon the dissolution of a marriage:
(1) A divorcing spouse who has assisted his wife or her husband in the accumulation of wealth during the marriage as reflected by an increase in net worth may be awarded lump-sum alimony reflecting an equitable portion of the increase. [Citations omitted].
(2) The payment of the lump-sum award may be secured by placing an equitable lien upon the property of the debtor spouse. [Citations omitted].
(3) Claims for property distribution incident to divorce may be agreed to by the parties in a property settlement. These agreements may be specifically enforced by the chancellor even to the extent of ordering the conveyance of realty from one spouse to the other. [Citations omitted].
(4) A spouse who has made a material contribution toward the acquisition of property which is titled in the name of the other may claim an equitable interest in such jointly accumulated property incident to a divorce proceeding. [Citations omitted].
Id. Moreover, Justice Prather stated in her concurrence in Jones that the old title theory in Mississippi was eroded, but not dead. Id. at 581-582. Today we write its obituary. The chancellor in a divorce case now has the authority to divest title from one spouse, and vest it in the other spouse, when equitably dividing the marital assets.
The Chancellor ordered that title to the marital home and adjoining lot be vested in Joan, with the home and the lot on which it sits being valued from $194,000.00 to $220,000.00, and the adjoining lot valued at $75,000.00. Joan was assigned all debt associated with the property as well. At the time of trial, the marital home was encumbered by a debt totaling $199,890.00, thereby rendering little, if any, equity in the house, and granting Joan an award of $37,500.00 additional equity in the jointly-owned lot. With this award, there was a simultaneous relief to Doug of more than $99,000.00 in debt.
Doug also contends that he should not be divested of title to his retirement funds, especially since Joan had retirement funds of her own.[3] Furthermore, Doug contends that *306 Joan is not entitled to any of his retirement plan as she did not contribute toward the accumulation of the fund.
Doug's contention that Joan did not contribute to the accumulation of "his" retirement funds is without merit. This Court has stated that in determining what is an equitable division, the chancellor is not limited to a consideration of the earning and cash contributions of each party to the accumulation of the property. It is sufficient contribution if one party renders services generally regarded as domestic in nature. White v. White, 557 So.2d 480, 485 (Miss. 1989) (quoting Jones, 532 So.2d at 580).
Joan contributed to the accumulation of wealth of both parties from the early days of the marriage when she worked and supported both Doug and herself, through the middle years when she taught school and Doug began his practice, to the waning days of the marriage when she worked at the Arts Commission, providing valuable contacts for Doug's successful practice. The times Joan did not work were usually due to childbirth or child-rearing, and done with the consent of her husband. Only after he became dissatisfied with the marriage did Doug decide that Joan had to work in order for their marriage to continue to be viable. He admitted at trial that her job at the Arts Commission was very stressful for Joan, but he enjoyed the social and business contacts that it brought him.
The Chancellor did not err in the equitable division of both the real and personal property. There was no abuse of discretion in awarding Joan the title to the marital home, relieving Doug of a substantial debt. Nor did the Chancellor abuse his discretion in granting Joan thirty-five per cent (35%) of Doug's retirement funds. There is substantial evidence that Joan contributed to the accumulation of wealth and the standard of living that she and Doug enjoyed as a couple.

III.
The remaining issues raised by Doug on appeal are devoid of merit and do not warrant discussion. Therefore, the Chancellor's decision is affirmed on these issues.

IV.
The Chancellor did not abuse his discretion in granting Joan a divorce on the ground of uncondoned adultery, or in denying Doug's request for a divorce on the ground of habitual cruel and inhuman treatment. The Chancellor also correctly awarded Joan periodic alimony in the amount of $4,200.00 per month, the title to the marital home and adjoining lot, thirty-five per cent (35%) of Doug's retirement funds, and attorneys' fees.
AFFIRMED.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN and PITTMAN, JJ., concur.
BANKS, J., dissents with separate written opinion joined by DAN M. LEE, P.J., and McRAE, J.
McRAE dissents with separate written opinion joined by DAN M. LEE, P.J., and SMITH, J.
BANKS, Justice, dissenting:
The majority opinion, in my view, is a break with our precedents without being explicit. This dissent is occasioned by the fact, however, that, even if we apply a new approach to the issue of divestiture of title, the result here obtained is inequitable.
The majority reasons that Mrs. Draper contributed her services to the family unit and, is therefore, entitled to an interest in the family home. The majority ignores the fact that Mrs. Draper already had an interest, a one-half interest, in the family home. What of Mr. Draper's contribution? The fact that Mrs. Draper is ordered to pay the mortgage is deceiving because periodic alimony is ordered in an amount sufficient to cover those payments. The majority does not bother to explain how Mrs. Draper's contribution entitles her to more than the one-half of the home that she already owned.
If the award of the home is divorced from the notion of just compensation for a contribution to its acquisition and viewed instead as a part of an overall property division, there are still problems. What is the percentage of the assets to which Mrs. Draper is *307 entitled? My calculations reflect that, assuming a $326,000 value of the Keogh and the equity in the house and lot come to $101,000, he is left with a net worth of $210,000 and she with one of $296,000. In other words, he winds up with 41% and she with 59% of the marital assets. Are we a community property state with a twist?
There are also serious issues left unresolved concerning the $125,000 to be paid from retirement funds. Is the amount to be paid calculated with reference to the liquidation value of the fund? Were tax consequences considered? I would reverse and remand this matter for further consideration in light of these concerns.
DAN M. LEE, P.J., and McRAE, J., join this dissent.
McRAE, Justice, dissenting:
Because the parties requested an equitable division of their marital assets, the majority has prematurely and perhaps, over-exuberantly, written the obituary on divestment of title in Mississippi. In his judgment and opinion, the chancellor wryly alluded to the tolling and ringing of bells, even the cacophony of bells "clash[ing] like the sound of an off-key saxophone moaning to a clarinet with a split reed." I, too, hear the discordant clanging of bells when I see that the majority has extended the chancellor's power to divest title to a party's interest in retirement and pension plans as part of the equitable division of marital property. Such plans are, instead, properly part of the stream of income to be considered when granting or modifying alimony or child support. Moreover, the chancellor abused his discretion in awarding an arbitrary percentage of the pension plan without regard for the tax consequences of the transaction. Accordingly, I dissent.
Mississippi is not a community property state. Therefore, one spouse has no vested right in the other's pension or retirement benefits. To the contrary, each spouse may maintain a separate estate. Armstrong v. Armstrong, 618 So.2d 1278 (Miss. 1993); Our cases have held that a spouse is not automatically entitled to an equal division of even jointly-acquired property. Brown v. Brown, 574 So.2d 688, 691 (Miss. 1990); Dillon v. Dillon, 498 So.2d 328, 330 (Miss. 1986). A pension plan is part of an individual's income or earnings. It is an asset which the chancellor may consider as part of the stream of income when determining alimony and child support incident to a divorce or modification thereof. Southern v. Glenn, 568 So.2d 281, 283-284, fn. 1 (Miss. 1990); Bowe v. Bowe, 557 So.2d 793, 795 (Miss. 1990). Thus, while the assets of Dr. Draper's retirement plan may be considered part of his income stream for purposes of alimony when the parties reach retirement age, they should not be considered part of the marital property subject to an immediate division or divestment of title.
Notwithstanding that Draper's retirement plan should not be included in the division of marital property, the chancellor's order that Mrs. Draper was entitled to $125,000.00 or thirty-five percent (35%) of the plan's current value is arbitrary and without any basis in the record. The chancellor does not enlighten us with the formula used to arrive at this "equitable" division. Is it based on the duration of the marriage, the number of years Draper (and Mrs. Draper) worked during the marriage, any contributions Mrs. Draper made to the plan in Draper's name, or the present value of the assets?
Finally, when asked for whom the bell tolls, Draper will realize that it tolls for the IRS, and not for him. The Drapers are in their early fifties, more than a decade away from retirement age and eligibility for penalty-free retirement plan withdrawals. As the chancellor's order is written, Draper is directed to "forthwith withdraw from his savings and from his IRAs the sum of $125,000 ... not later than December the 15, 1991," saddling him with a potentially enormous tax burden  the premature withdrawal penalty as well as the income tax consequences of the IRA withdrawal. This could leave Draper with additional tax liability of $40-50,000.00. Obviously, the chancellor failed to take this into consideration, allowing Mrs. Draper a generous windfall. When alimony, child support or other spousal maintenance is ordered to be paid from a retirement or pension plan, *308 the chancellor should specify how the tax consequences of the transaction will be divided between the parties or adjust the amount of the award to accommodate the IRS's share.
Because Dr. Draper's retirement plan should not have been subject to division as a marital asset, and such division was made arbitrarily and without regard for the tax consequences of the divestment, I dissent.
DAN M. LEE, P.J., and SMITH, J., join this opinion.
NOTES
[1] Joan was scheduled to receive her master's degree in December, 1991.
[2] Mississippi is the only state in the Union that continues to adhere to the title theory in property distribution in a divorce case. 22 Fam.L.Q. 367, 393-394 (1989). See also Crafts v. Morgan, 776 P.2d 1049, 1053 n. 4 (Alaska 1989).
[3] Doug's retirement plan is listed as containing $362,054.85. Joan's IRA account balance is listed as $13,580.84. The Chancellor awarded Joan $125,000.00 from Doug's retirement plan, or thirty-five per cent (35%) of the total value.