645 So.2d 944 (1994)
Joan (Tate) RUFF
v.
Robert Jean RUFF, Jr.
No. 93-CA-0293.
Supreme Court of Mississippi.
November 17, 1994.
Drue D. Birmingham, Jr., Olive Branch, for appellant.
No Brief Filed for appellee;
Before HAWKINS, C.J., and PITTMAN and BANKS, JJ.
HAWKINS, Chief Justice, for the Court:
On August 24, 1990, appellant Joan (Tate) Ruff (hereinafter Joan) filed a Complaint in the Nature of a Bill for Divorce. Sometime later, on January 7, 1992, she filed an Amended Complaint for Divorce. On January 21, 1992, Joan filed a Motion for Temporary Relief and a Complaint for Temporary Restraining Order Without Notice. The Temporary Restraining Order Without Notice was granted that same day.
On January 28, 1992, Joan's husband Robert Jean Ruff, Jr. (hereinafter Robert), responded with his Answer to Complaint for Divorce and Counterclaim. Joan replied in turn with an Answer to Counterclaim for Divorce on February 3, 1992. Then, on February 10, 1992, her Order for Temporary Relief was granted. A hearing was held December 8, 1992, in the Chancery Court of DeSoto County before Chancellor Melvin McClure and a Final Decree of Divorce was entered December 21, 1992.
Joan subsequently filed a Motion to Amend Judgment on December 23, 1992, which was denied on February 24, 1993. On March 16, 1993, she filed a Notice of Appeal.

FACTS
Joan (Tate) Ruff and Robert Jean Ruff, Jr., were married on April 11, 1984. No children were born to Joan and Robert although during the course of the marriage he adopted her daughter Nicole, born June 4, 1973.
In 1986 Robert's parents gave about an acre and a half of land to him and Joan as tenants in the entirety. This gift split up a 20-acre tract which the parents owned and on which they lived. Robert and Joan then built a Jim Walter home upon their newly-acquired land. The value of this house is hard to determine. At the time of the hearing, a home mortgage of $46,000 was still outstanding. Furthermore, according to Joan, Robert was responsible for extensive damage caused to the home in her absence which would have to be repaired before the home could be sold. Finally, Joan stated that in her opinion the land was worth $1,300 an acre and the house was worth $50,000-$60,000.
At the hearing, both parties testified that their marriage suffered greatly because of Robert's excessive drinking. According to Joan, Robert became intoxicated and passed out daily by drinking half a liter of Jack Daniels. He in turn admitted that his alcoholism was the primary cause of the problems *945 in their marriage. Joan additionally stated that Robert's drinking binges at times became violent with him attempting to kick in their bedroom door once, breaking their living room window twice, and trying to choke her so many times that she lost count. She also claimed that at one point in June of 1990:
Again he was drunk and he was mad at me this time, I don't know why, I think I had told him that if he didn't try to get some help that I was leaving, and he ran into the bedroom and he got his gun, and I was sitting at the dining room table and as he started towards me with the gun I ran to the phone and I called his parents' house, and his dad answered the telephone, and I said your son is standing here with a gun pointed to my head, I suggest you get back here now, and I hung up the phone, and as I hung up the phone Bob pulled the trigger of the gun and he said I can get rid of you faster than you can leave.
Joan left Robert that same month and filed for divorce on the grounds of irreconcilable differences the following August 24. She returned in April of 1991, however, after Robert completed an alcoholic treatment program at Parkwood. Nevertheless, according to Joan, the drinking and violence soon resumed despite the treatment. She stated that another incident happened in December of 1991:
He had come in from his parents' house, and he was drunk. He first passed out on the couch, and when he finally woke up he was made [sic] because I had not gone up to his parents', stopped at his parents' house when I had come in, and he proceeded to knock everything off of the coffee table, and ended throwing the coffee table upside down, and it has got glass inserts, and then he went into the kitchen and he got a knife, and he started towards me with it, and I ran.
The record states that Joan left Robert for the final time in November of 1991.[1] On January 7, 1992, Joan filed an Amended Complaint for Divorce which added the grounds of habitual cruel and inhuman treatment and habitual drunkenness.
In addition, the amended complaint also contained an elaborate plan for the disposition of the parties' house. Joan requested that:
D. (1) The Court divest the Defendant's undivided interest in and to the family residence at 711 Ross Road, Olive Branch, DeSoto County, Mississippi, and vest it in the Plaintiff.
Or, in the Alternative:
D. (2) The Defendant shall quitclaim to the Plaintiff all of his right, title and interest in and to the family residence at 711 Ross Road, Olive Branch, DeSoto County, Mississippi. The Plaintiff shall be responsible for and pay all indebtedness thereon, and all taxes and insurance.
Or, in the Alternative:
D. (3) The Plaintiff shall be awarded exclusive use and possession of the parties' residence at 711 Ross Road, Olive Branch, DeSoto County, Mississippi, for so long as child support is payable by the Defendant, or for forty-eight (48) months, whichever is longer.
If at any time the Plaintiff, at her option, vacates said property, or if she remarries, either party may place said property on the market for sale, and the net proceeds thereof shall be divided between the parties as hereinafter described:
If the sale is closed by January 1, 1993, then the net equity shall be divided sixty percent (60%) to the Plaintiff and forty percent (40%) to the Defendant. The Defendant's equity shall decrease ten percent (10%) for each additional year before sale, to wit:
1) If the sale is closed between January 2, 1993, and January 1, 1994, the Defendant's equity shall be 30%.
2) If the sale is closed between January 2, 1994, and January 1, 1995, the Defendant's equity shall be 20%.
3) If the sale is closed between January 2, 1995, and January 1, 1996, the Defendant's equity shall be 10%.

*946 4) After January 1, 1996, the Defendant shall have no equity in said property.
As soon as it is determined and applicable that the property be sold, the parties shall make every reasonable effort to close the sale as soon as practicable. If there be disagreement between the parties as to the selling price of said property, the Plaintiff shall have the property appraised by a qualified, disinterested real estate appraiser, and the fair market value so determined shall be the minimum amount the parties shall be required to accept in the absence of any agreement between the parties to the contrary.
Nothing provided hereinabove shall preclude either party from initiating a partition suit if the Plaintiff vacates said property or remarries; however, the division of net equity shall be as provided in this section.
During the period in which the Plaintiff occupies said property, the Plaintiff shall be responsible for the home note to Mid-State Homes, taxes, insurance and maintenance thereon.
Any deficiency in the payments of child support by the Defendant as provided herein shall be deducted from his share of the equity therein, and shall constitute a lien on his interest in said property.
Robert filed an Answer to Complaint for Divorce and Counterclaim on January 28, 1992, to which Joan replied on February 3, 1992.
A hearing was held before Melvin McClure on December 8, 1992, who handed down his Final Decree of Divorce on December 21, 1992. The Chancellor granted Joan a divorce on the grounds of habitual cruel and inhuman treatment and habitual drunkenness. His decree also stated:
6. IT IS FURTHER ORDERED, ADJUDGED AND DECREED that, with reference to the parties' residence presently titled in both names, inasmuch as the Court does not have the authority to divest title from the Defendant and place it in the Plaintiff, no order shall be made relative thereto except that either party shall have the right to bring a Petition For Partition of said residence. Further, the Court makes no order regarding who shall occupy said residence or be responsible for the monthly mortgage payments thereon pending a sale, division, or other disposition of said residence.
... .
8. IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Plaintiff be awarded reasonable attorney fees in the sum of $2,820.55, payable from the Defendant's share of the equity in the parties' residence, if and when said residence is sold. Further, such sum is to attach as an equitable lien on the Defendant's equity in said residence, and shall draw interest at the rate of 8% annually, beginning January 1, 1993, until paid. IT IS FURTHER ORDERED, ADJUDGED AND DECREED that if said residence is not sold within a reasonable time, or if the Defendant's equity therein is not sufficient for the payment of such $2,820.55 plus interest, then such sum or any deficiency therein, shall be paid by the Defendant at the rate of $100.00 per month.
Disagreeing with the Chancellor's disposition of the property and plan for payment of attorney fees, Joan filed a Motion to Amend Judgment on December 23, 1992, which was denied by Chancellor McClure on February 24, 1992. Joan appealed to this Court on March 16, 1993.

LAW
Although the appellant Joan Ruff cites four issues in her brief for this court to consider on appeal,[2] there is actually only one  can a chancellor divest title from one spouse in a divorce action and vest it in the other?
In the past there was some amount of confusion in the law of Mississippi as to whether a chancellor was so authorized. However, the case of Draper v. Draper, 627 So.2d 302 (Miss. 1993), laid the matter to rest. In that case the chancellor took title in the family home from the husband and forced him to deed it to his wife. In affirming the *947 actions of lower court, this Court stated, "The chancellor in a divorce case now has the authority to divest title from one spouse, and vest it in the other spouse, when equitably dividing the marital assets." Id. at 305. Furthermore, in order to determine what the proper equitable division of property between the spouses should be, a chancellor must make a careful analysis of the parties' economic contributions to the marriage. Johnson v. Johnson, 550 So.2d 416 (Miss. 1989). Ferguson v. Ferguson, 639 So.2d 921 (Miss. 1994), and Hemsley v. Hemsley, 639 So.2d 909 (Miss. 1994), provide useful guidelines for making this equitable division.
The chancellor did not have the benefit of our decisions in Draper, Ferguson, and Hemsley that chancellors do have the authority to transfer title, and therefore did not have the occasion to consider the factors set forth in those decisions. We therefore reverse and remand for the chancellor to consider the principles enunciated in those recent decisions. In addition, as the chancellor's plan for repayment of attorney's fees was based upon his pre-Draper division of property, it too should be reversed and redetermined consistent with our recent holdings.
This case is therefore reversed and remanded for proceedings not inconsistent with this opinion.
REVERSED AND REMANDED FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.
DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, PITTMAN, BANKS, JAMES L. ROBERTS, Jr., and SMITH, JJ., concur.
McRAE, J., concurs in result only.
NOTES
[1] Note that this places the December, 1991, violent episode one month after Joan had moved out. The record does not explain this discrepancy.
[2] It bears noting that the appellee Robert Ruff did not file an appellee's brief.