# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 1999-CA-00915-COA

**CONCHETTA MCNEER SANDERSON**                                      **APPELLANT**

**v.**

**ROBERT BUCK SANDERSON**                                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/27/1999 |
| TRIAL JUDGE: | HON. FRANKLIN C. MCKENZIE JR. |
| COURT FROM WHICH APPEALED: | JONES COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JOHN WINCIE LEE JR. |
| | PAUL RICHARD LAMBERT |
| ATTORNEY FOR APPELLEE: | WAYMAN DAL WILLIAMSON |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | DIVORCE AWARDED ON GROUND OF IRRECONCILABLE DIFFERENCES. HUSBAND ORDERED TO PAY $1500 PER MONTH IN PERIODIC ALIMONY. WIFE AWARDED $200,000 IN LUMP SUM ALIMONY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART- 9/19/00 |
| MOTION FOR REHEARING FILED: | 9/29/2000; denied 11/21/2000 |
| CERTIORARI FILED: | 12/4/2000; granted 2/15/2001 |
| MANDATE ISSUED: | |

BEFORE McMILLIN, C.J., LEE, AND THOMAS, JJ.

McMILLIN, C.J., FOR THE COURT:

¶1. Conchetta Sanderson and Robert Sanderson were divorced in a proceeding in the Chancery Court for the Second Judicial District of Jones County after a marriage of some twenty-one years duration. Both parties consented to the entry of the divorce judgment on the ground that irreconcilable differences had arisen between them. However, the parties were unable to agree upon the financial aspects associated with the dissolution of the marriage and, by written agreement, submitted those issues to the chancellor for determination. Mrs. Sanderson has now appealed certain provisions of the chancellor's financial awards on the basis that the chancellor abused his discretion in not following established rules set out in applicable Mississippi case law.

¶2. More particularly, Mrs. Sanderson raises two separate issues. First, she contends that the chancellor erred in determining that shares of stock in Sanderson Farms, Inc., titled solely in the name of Mr. Sanderson and having substantial value, were not marital assets subject to equitable division. Mrs.

Sanderson's second issue sounds in the alternative and suggests that, if the chancellor was correct in determining that the Sanderson Farms stock was not a marital asset, the chancellor abused his discretion in denying her a more substantial sum by way of alimony in order to adequately provide for her financial needs in the post-divorce years of her life.

¶3. For reasons we will proceed to explain, we conclude that Mrs. Sanderson's second issue has merit and we, therefore, reverse and remand for further proceedings consistent with the terms of this opinion.

## I.

## Facts

¶4. The Sandersons were married in 1977. At the time of divorce, the parties had two minor children, custody of both of whom was awarded to Mr. Sanderson. From the standpoint of economics, the evidence indicated that the parties had led a comfortable but not extravagant lifestyle financed in part by Mr. Sanderson's earnings and in part by dividend income from Mr. Sanderson's holdings of Sanderson Farms, Inc. Mr. Sanderson had acquired his holdings in the corporation principally from family gifts, stock dividends and stock splits. The stock was publicly traded and, as of the time of the divorce, had a market value in the range of $4,000,000. Mr. Sanderson was employed by Sanderson Farms at the time of divorce and there was evidence that, through salary and dividends, Mr. Sanderson could reasonably expect an annual income in excess of $100,000. On the other hand, Mrs. Sanderson had ceased working outside the home during this lengthy marriage in order to devote herself to the rearing of the children. She had a college degree that would permit her to obtain employment as a school teacher, an area in which she had worked in the early years of the marriage. The evidence suggested that, if Mrs. Sanderson returned to the teaching force, she could expect to enjoy an annual income of approximately $22,000 from her endeavors.

¶5. The parties owned a modest home valued at approximately $54,250, which was subject to an outstanding mortgage having a balance of about $30,000. There was no significant accumulation of other assets. Neither party had any funds in a retirement account or pension fund except for a small retirement account of several thousand dollars held by Mr. Sanderson. Mrs. Sanderson testified that the parties had intended to rely upon Mr. Sanderson's accumulated wealth in the form of his Sanderson Farms holdings to provide for their retirement, and that the size of his holdings rendered the need for formal retirement planning less urgent than in the normal case.

¶6. There was some conflict in the evidence regarding the state of Mrs. Sanderson's health. She offered medical evidence that would support a contention that, due to a back ailment, it was not advisable for her to return to full-time school-teaching duties. However, Mr. Sanderson produced videotaped evidence of Mrs. Sanderson participating in a tennis tournament with no apparent difficulty, suggesting that her physical disabilities were not so grave as she might contend. The chancellor resolved this conflict in favor of the position that Mrs. Sanderson was not disqualified by her medical problems from pursuing a teaching career in order to provide at least some part of her own post-divorce support.

## II.

## The Chancellor's Financial Awards

¶7. Based on this evidence, the chancellor determined that Mr. Sanderson's holdings in Sanderson Farms were not marital assets subject to equitable division. He did nothing, therefore, in terms of awarding Mrs.

Sanderson any portion of the accumulated shares of this corporation. The chancellor awarded Mrs. Sanderson the marital homeplace on condition that she assume the balance due on the mortgage (alternatively, she was permitted to require Mr. Sanderson to purchase her interest in the property for $15,000 if she did not want to obtain title to the home on those terms), lump sum alimony in the amount of $200,000, and rehabilitative alimony of $1,500 per month for thirty-six months. There were other matters resolved, including automobile ownership, responsibility for certain outstanding financial obligations and the like, none of which bear significantly on the issues presented in this appeal.

## III.

### The First Issue: Was the Sanderson Farm Stock a Marital Asset?

¶8. Any question as to the chancellor's ability in a divorce proceeding to equitably divide assets acquired by a married couple during the marriage without regard to which spouse held legal title to the assets was dispelled in the case of *Draper v. Draper,* 627 So. 2d 302, 305 (Miss. 1993). In *Hemsley*, the Mississippi Supreme Court concluded that property acquired during a marriage by either party was presumptively a "marital asset" that could be subjected to an equitable division upon the dissolution of the marriage. *Hemsley v. Hemsley,* 639 So. 2d 909, 915 (Miss. 1994). It became largely a matter of irrelevancy as to which marital partner held legal title to such assets since the supreme court specifically acknowledged the chancellor's legal authority to divest title out of one party to the proceeding and vest it in another. *Draper,* 627 So. 2d at 305.

¶9. Nevertheless, the *Hemsley* decision recognized several instances where property owned by one spouse would not fall into the category of marital assets subject to equitable division. Numbered among those exceptions was property brought into the marriage and property acquired by either spouse in that spouse's individual capacity through inheritance or family gift. *Hemsley,* 639 So. 2d at 914. As to that sort of property, the supreme court determined the chancellor to be powerless to shift ownership in pursuit of an equitable resolution of the financial aspects of a divorce. *Id.*

¶10. In the subsequent case of *Johnson v. Johnson*, the supreme court considered the matter of marital assets further and concluded that, upon proper proof, the chancellor could find that one spouse owning separate property not subject to equitable division had, during the course of the marriage, permitted his or her separate estate to be appropriated to family purposes to the extent that it was deemed to have been "commingled" with other marital assets and, thereby, rendered susceptible to being equitably divided at the end of the marriage. *Johnson v. Johnson,* 650 So. 2d 1281, 1286 (Miss. 1994).

¶11. In this case, Mrs. Sanderson argues that Mr. Sanderson's stock in Sanderson Farms had, over the course of this lengthy marriage, been commingled with other marital assets such that it was appropriate for the chancellor to equitably divide the stock between the two parties based upon those factors enumerated in *Ferguson v. Ferguson,* 639 So. 2d 921, 928 (Miss. 1994). She suggests three main considerations which she argues warrant a finding that the stock had lost its character as separate property belonging solely to Mr. Sanderson and had become, instead, a marital asset. First, she urges that the uncontested fact that dividend income from the stock was used to meet normal recurring family obligations demonstrates that the stock was considered a marital asset by both parties. Secondly, she testified that some significant portion of the stock acquired by Mr. Sanderson by way of gifts from family members after the parties were married was, in actuality, intended to be a joint gift to her and Mr. Sanderson and that the title was vested solely in his name because of certain tax considerations. Thirdly, Mrs. Sanderson urges that the lack of any

significant formal provision for retirement income for either her or Mr. Sanderson was, in itself, proof of her contention that the parties intended the stock to provide financial security for both of them in their retirement years, giving it the character of commingled property. We will consider these contentions in the order they were set out.

## A.

### Use of Stock Dividends

¶12. Mrs. Sanderson contends that the decision to use stock dividends for family purposes was an act of commingling of the stock itself, converting it from a nonmarital asset to marital property subject to equitable division. She bases her argument on this point principally on the case of *Johnson v. Johnson,* 650 So. 2d 1281 (Miss. 1994).

¶13. In *Johnson,* Mrs. Johnson inherited a sizable quantity of land used to grow marketable timber. During the course of the marriage, timber of significant value was harvested from the property and the sales proceeds used for family purposes. The supreme court held that "[w]hen . . . [Mrs. Johnson] commingled the monies received from the sale of timber, she converted these nonmarital assets to marital assets, subject to equitable distribution . . . ." *Id.* at 1286. Mrs. Sanderson contends that this passage indicates that the land itself was converted to a marital asset. We disagree, while conceding that the quoted language of the opinion is capable of being misconstrued in this manner. Read in the context of the entire opinion, we are satisfied that this quoted phrase referred only to the proceeds derived from the earlier timber sales rather than to the timber land. The opinion observes that not all the sale money was spent but that some of it was "placed in savings accounts controlled by Wayne." It is apparent that the supreme court concluded that this was an act of commingling of these funds. *Id.* The opinion goes on to observe that $66,000 of the timber sale proceeds that had acquired the characteristic of a marital asset by virtue of its commingling had reacquired its nonmarital status because Mr. Johnson had returned that part of the funds to Mrs. Johnson's exclusive control. *Id.* In contrast to this discussion clearly relating to the character of funds derived from timber sales still on hand at the end of the marriage, the supreme court elsewhere states unequivocally that Mrs. Johnson's separate nonmarital property includes "inherited assets that were never commingled with funds for the family," and goes on to enumerate those assets in a listing that includes "timber land, and marketable timber . . . ." *Id.*

¶14. Concluding that *Johnson* does not support Mrs. Sanderson's position does not, of itself, resolve the question against her. Nevertheless, in the absence of specific authority for the proposition that commingling dividends derived from nonmarital stock is an act of commingling of the shares of stock themselves, we do not find Mrs. Sanderson's arguments on this score persuasive, and we conclude that something more would have to be shown to make a convincing case that Mr. Sanderson intended to, or by his actions inadvertently did in fact, so convert the use of his shares of Sanderson Farms as to change its character from nonmarital to marital property.

¶15. We find this theory, therefore, to be without merit.

## B.

### The Joint Gift Allegation

¶16. Mrs. Sanderson's contention that at least some portion of the stock transferred to her husband after

the marriage was intended to be a joint gift was rebutted by testimony of family members that the intention was to vest the stock solely in Mr. Sanderson. This posed a classic disputed issue of fact. In proceedings such as this, the chancellor sits as finder of fact, and we may not disturb such findings of fact unless we are satisfied that the chancellor was manifestly in error. *Id.* at 1285. The chancellor elected to accept as true the testimony of Mr. Sanderson's relatives. Such testimony squared with the undisputed evidence that no effort was ever made to vest the stock jointly in the names of Mr. and Mrs. Sanderson. We can find no basis to disturb the chancellor's determination on this score.

## C.

### Lack of Formal Retirement Planning

¶17. We conclude that evidence that the parties had no formal retirement plans in place, even if it is accepted as true that the reason for this was the parties' reliance on Mr. Sanderson's separately-held wealth, does not support a finding that the stock has been so committed to family purposes as to constitute an act of commingling under such decisions as *Johnson*, 650 So. 2d at 1281.

¶18. For all the foregoing reasons, therefore, we conclude that the chancellor did not commit reversible error when he concluded that Mr. Sanderson's holdings were nonmarital assets not subject to equitable division upon the dissolution of the marriage.

## IV.

### The Second Issue: The Alimony Award

¶19. Mrs. Sanderson's second issue is framed as an alternative proposition. She urges that, even conceding that Mr. Sanderson's holdings in Sanderson's Farms are nonmarital property in which she has no interest, the disparity in the post-divorce financial posture of the two parties is so great that the award of $200,000 in lump sum alimony and $54,000 in rehabilitative alimony is not an equitable resolution of the financial issues submitted to the chancellor for decision. Mrs. Sanderson points out that, at this stage, the value of nonmarital assets becomes a legitimate part of the chancellor's calculations aimed at ensuring that each party is adequately provided for. *Johnson,* 650 So. 2d at 1287.

¶20. Mrs. Sanderson points out that, by virtue of the divorce, she has been denied the anticipated cushion of Mr. Sanderson's extensive holdings in Sanderson Farms as a source of financial security during her retirement years. She further points out that, in the years following the divorce, even if she is successful in returning to the teaching profession, her income will be substantially less than that enjoyed by Mr. Sanderson. Thus, she argues, it is simply not equitable, upon the dissolution of a marriage that exceeded twenty years in length, during which she forsook a professional career in favor of working in the home and in the day-to-day matters of child-rearing, to leave Mr. Sanderson with a multi-million dollar stock portfolio, and an annual income anticipated to be routinely in excess of $100,000 while she is left without any meaningful support beyond her own labor once the relatively brief period of rehabilitative alimony is exhausted. Mr. Sanderson counters that argument with the proposition that, in addition to those amounts Mrs. Sanderson may reasonably be expected to receive from working as a schoolteacher, she may also be expected to have income in the range of $14,000 a year as interest earnings on her lump sum alimony award, which when combined with anticipated earnings, should adequately meet her needs.

¶21. It is the view of this Court that, even conceding the correctness of the chancellor's conclusion that Mrs.

Sanderson's physical disabilities do not prevent her from returning to the teaching profession, this disparity in the comparative financial position of these two parties after such an extended marriage constitutes the kind of "deficit" that should invoke considerations of some higher level of alimony than was awarded in this case - an obligation that Mr. Sanderson can certainly take on without unduly impacting his ability to live comfortably and securely from a financial standpoint. *See Gray v. Gray,* 562 So. 2d 79, 83 (Miss. 1990). Though the record reflects that the parties to this marriage did not lead an extravagant lifestyle, it is clear that they were at all times financially secure and there appears no reason why Mrs. Sanderson should not be entitled to some more reasonable measure of financial security than would exist were she entirely dependent for the remainder of her productive life on her own earnings as a schoolteacher while her former husband continued to receive the exclusive benefit of the stock holdings that, though indirectly, were the source of a substantial part of the family's disposable income throughout the marriage.

¶22. We concede that the $200,000 lump sum alimony appears on its face to offer a substantial measure of financial security. However, were Mrs. Sanderson forced to resort to the income produced by this sum to supplement her annual earnings simply to raise her standard of living to something that would approximate that enjoyed by her during the marriage, this sum could become substantially eroded through the effects of inflation over time. Mrs. Sanderson was only forty-one years old at the time of divorce, and it would appear at least questionable that this fund, with no accumulated income over the years, could serve as an adequate substitute for the rather comfortable financial situation at retirement that she could reasonably have anticipated had the marriage continued. We are satisfied that one of the principal purposes of this award by any rational analysis, was to provide Mrs. Sanderson a meaningful reserve of financial support for the extended future. To require her to use some part of that fund, or even the income produced from it, to supplement her own earnings in order to meet her basic living costs in the short term would substantially defeat that purpose. Certainly, by taking into account Mr. Sanderson's substantial nonmarital estate (as permitted by *Johnson*), it would appear that Mr. Sanderson enjoys a high level of financial security for the future that does not depend upon his own continued employment. In view of the length of this marriage and Mrs. Sanderson's sacrifice of her own professional career to further the purposes of this marriage, we conclude that it would be inequitable to deny her some reasonably equivalent measure of financial security greater than was afforded her under the combined lump sum and rehabilitative alimony award now under consideration.

¶23. Having concluded that there is an inequitable disparity in the post-divorce financial condition of the parties, including the marked disparity between Mr. Sanderson's anticipated disposable annual income and the income Mrs. Sanderson can reasonably expect even assuming she will be able to utilize her marketable skills to the maximum, we conclude that the chancellor's decision to deny Mrs. Sanderson an amount, in some combination of lump sum, periodic, and rehabilitative alimony that would permit her to both (a) live comfortably in a style somewhat equivalent to that she enjoyed during the marriage and (b) enjoy a greater measure of financial security at the end of her normal work career was an abuse of the chancellor's discretion in such matters.

¶24. For the foregoing reasons, we affirm the chancellor's decision to deny equitable division of the Sanderson Farms stock held solely by Mr. Sanderson. However, we reverse those aspects of the judgment relating to lump sum and rehabilitative alimony and remand this cause for further consideration of an award of some combination of the available forms of alimony (lump sum, periodic, and rehabilitative) that would, in the aggregate, more completely address the financial considerations discussed in this opinion.

¶25. **THE JUDGMENT OF THE CHANCERY COURT OF THE SECOND JUDICIAL DISTRICT OF JONES COUNTY IS AFFIRMED AS TO THE DETERMINATION THAT THE APPELLEE'S STOCK HOLDINGS WERE NOT MARITAL PROPERTY. THE JUDGMENT IS REVERSED AND REMANDED FOR A DETERMINATION OF A SUITABLE AMOUNT OF ALIMONY CONSISTENT WITH THE TERMS OF THIS OPINION. COSTS OF THIS APPEAL ARE DIVIDED EQUALLY BETWEEN THE APPELLANT AND THE APPELLEE.**

**KING AND SOUTHWICK, P.JJ., LEE, MOORE, AND THOMAS, JJ., CONCUR. PAYNE, J., DISSENTS WITH SEPARATE WRITTEN OPINION. IRVING, J., CONCURS IN PART AND DISSENTS IN PART JOINED BY BRIDGES, J.**

**MYERS, J., NOT PARTICIPATING.**

PAYNE, J., DISSENTING:

¶26. While I concur with the majority's interpretation of *Johnson* in stating the timber land was not commingled, as opposed to the monies from timber sales, I respectfully dissent from the majority's decision as to classification of the Sanderson Farms stock as non-marital. The present case is distinguishable from *Johnson*. Not only were the dividends from the Sanderson Farms stock commingled by placement in a joint account and use for family purposes, the stock was being viewed as a retirement fund for the support of both husband and wife. Conveniently, Mr. Sanderson testified that he was not counting on the stock as a retirement fund because it may be of no value by that time. However, Mr. Sanderson also elected to not participate in the 401(k) program available to him at Sanderson Farms, nor any other retirement program except a small amount put in an IRA one year. While I understand that raising a family of four costs money, it again seems convenient for Mr. Sanderson to claim that no retirement fund was established because he did not have enough money to contribute, especially considering his annual salary in the $100,000 range, and consistent dividends of over $50,000 per year. As stated by the *Johnson* court, "pension and retirement plans are presumptively part of the marital estate for purposes of divorce, as they were acquired by the efforts of both [parties] during the course of the marriage. . . . Consequently these plans are subject to equitable distribution pursuant to *Hemsley*." *Johnson*, 650 So. 2d at 1286 (citations omitted). In *Ferguson v. Ferguson,* 639 So. 2d 921, 934 (Miss. 1994), the court held:

> the spouse without retirement funds in his/her own name could instead have been working outside the home and/or investing his/her wages in preparation for his/her own retirement. When separate plans for each spouse are not in existence, it is only equitable to allow both parties to reap the benefits of the one existing retirement plan, to which both parties have materially contributed in some fashion.

¶27. In *Hankins v. Hankins*, 729 So. 2d 1283 (Miss. 1999), the Mississippi Supreme Court found that the chancellor was not wrong in determining that stock certificates given to Mr. Hankins by his father during the marriage were marital property. In that case, Mr. Hankins worked at his father's lumber company prior to the marriage and until shortly before separation from Mrs. Hankins. He was given eleven shares of stock in the business prior to the marriage, and fifty seven and one-half shares during the marriage. The chancellor awarded the value of eleven shares to Mr. Hankins, and determined that the value of the other shares should be equitably divided between the parties. On appeal, Mr. Hankins suggested that the stock was not subject to equitable division as it represented a series of inter vivos gifts from his father.

¶28. The Mississippi Supreme Court reviewed the requirements an inter vivos gift must meet, and found of

particular interest the requirement that the gift be gratuitous. Although Mr. Hankins's father stated that his reason for giving the stock had nothing to do with his son's employment at the lumber company, the court stated "we cannot say that the stock was either a gift, given gratuitously, or was in consideration of work done at the lumber company." The *Hankins* court then went on to quote the rule from *Hemsley v. Hemsley,* 639 So. 2d 909, 915 (Miss. 1994), that any and all property acquired or accumulated during the marriage is marital property and subject to equitable distribution. *Hankins*, 729 So. 2d at 1287. The *Hankins* court further quoted *Hemsley* when it stated:

> [I]t would be grossly unfair to allow the defendant to divorce his wife and either remarry or allow some other woman to reap the benefits of the plan acquired during the best years of their life. He should not live in comfort while the ex-spouse becomes destitute . . . .

*Hankins*, 729 So. 2d at 1287. The *Hankins* court then equated the stock certificates to the retirement plan in *Hemsley* and stated:

> Likewise, in this case, it would be grossly unfair to allow Charlie to reap the benefits of his stock certificate proceeds, acquired during the marriage while he worked and Sherry was, at his insistence, a homemaker and primary care giver to the children, by allowing him to characterize the stock as inter vivos gifts.

*Id.*

¶29. Despite testimony from a family member denying that stock was given as remuneration, and without any argument that the stock had been commingled, the *Hankins* court upheld the chancellor's ruling that stock acquired during the marriage was subject to equitable distribution. In the present case, Mr. Sanderson's father testified that his intention was to vest the stock in his son alone, rather than giving is as a gift to both parties. The stock was not given to Mr. Sanderson as remuneration for work done at Sanderson Farms; however, it does appear that the parties intended to use the stock as their retirement fund. In such case, the language from *Ferguson, Hemsley,* and *Hankins* shows that the Mississippi Supreme Court would not approve of denying Mrs. Sanderson her rightful part of property acquired during the marriage and relied upon as support for the retirement years. I, therefore, respectfully dissent from the majority's affirmance of the determination that the appellee's stock holdings were not marital property.

IRVING, J., CONCURRING IN PART, DISSENTING IN PART:

¶30. I concur with the majority's resolution of the issues except as to the lump sum and rehabilitative alimony awards. The majority concludes that the awards of $200,000 in lump sum alimony and $1,500 per month for thirty-six months in rehabilitative alimony are inadequate primarily because Robert will be in a substantially better position financially than will Conchetta at the time of retirement. The majority reaches this conclusion despite the fact that Robert's future financial condition will be due to his ownership of non-marital stocks that Robert received from his family, not as a result of assets accumulated during the marriage.

¶31. Alimony is premised upon "the duty of the husband to support his wife . . . in the manner to which she has become accustomed, to the extent of his ability to pay." *Watson v. Watson*, 724 So. 2d 350 (¶17) (Miss. 1998). It goes without saying that one who is not in retirement at the time alimony is awarded has not grown accustomed to any particular lifestyle in retirement. Therefore, it seems to me, to award alimony for

the purpose of equalizing the parties' lifestyle at some future date is beyond the pale and has no legal basis in our jurisprudence.

¶32. I recognize the responsibility of the chancellor to make an equitable distribution of the marital estate. As a part of making that calculation and assessment, the chancellor has the right and indeed the obligation to take into account retirement accounts that either or both parties had during the course of the marriage. Equities may be adjusted accordingly, but when, as here, neither party has a retirement account accumulated during the marriage, the chancellor in my opinion is left with the singular authority of dividing the marital estate as it exists at the time of the divorce, not what it might look like years later when one party begins drawing down an admittedly non-marital asset that arguably would have benefitted both parties during their retirement years had the marriage not failed.

¶33. I can find no basis for holding the chancellor in error for not awarding retirement income to Conchetta from a non-marital asset under the guise of a holding that the alimony awarded was inadequate to maintain Conchetta in the modest lifestyle to which she was accustomed. It seems to me that this is the real thrust of the majority's holding.

¶34. The chancellor awarded Conchetta $200,000 in lump sum alimony. Robert's ability to pay this amount is certainly dependent upon his ability to use a portion of his non-marital stock portfolio. Were he not possessed of this stock portfolio, it would be difficult to see how he could pay it. He could not pay it from his salary. The effect of this lump sum award is, in my opinion, to tap into Robert's non-marital assets. The tap could have been a lump sum tap or a periodic tap. The chancellor in effect made the tap periodic.

¶35. The parties lived a modest lifestyle and had not accumulated any significant wealth during the marriage. It is difficult for me to discern how an award of $200,000 in lump sum alimony and $1,500 per month in rehabilitative alimony for three years are inadequate to sustain Conchetta in the modest lifestyle to which she had been accustomed. Had the chancellor not awarded the lump sum alimony, I could see the majority's point.

¶36. It is my understanding from the record that the marital estate consisted of (1) approximately $24,000 equity in the marital domicile which was valued at $54,250, (2) a 1996 Toyota Camry which had been transferred to Conchetta after the filing of the divorce complaint, (3) a small IRA account worth $2,000 to $3,000, and (4) checking accounts with limited unspecified amounts.

¶37. The chancellor found that Conchetta's non-marital assets consisted of approximately $140,000 in inheritance and a one-third interest in a farm, the value of the interest being approximately $30,000. On these facts, I am unwilling to hold the chancellor in error on the alimony awards.

**BRIDGES, J., JOINS THIS SEPARATE WRITTEN OPINION.**